# YEE ET AL. *v.* CITY OF ESCONDIDO, CALIFORNIA

No. 90–1947.   Argued January 22, 1992—Decided April 1, 1992

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, SCALIA, KENNEDY, and THOMAS, JJ., joined. BLACKMUN, J., *post*, p. 539, and SOUTER, J., *post*, p. 539, filed opinions concurring in the judgment.

*Robert J. Jagiello* argued the cause for petitioners. With him on the briefs was *Robert H. Bork.*

*Carter G. Phillips* argued the cause for respondent. With him on the brief were *Rex E. Lee, Donald R. Lincoln, Linda B. Reich, David R. Chapman,* and *Jeffrey R. Epp.**

---

*Briefs of *amici curiae* urging reversal were filed for Action in Santa Monica by *Brenda Powers Barnes;* for the Apartment Association of Greater Los Angeles by *Stephen L. Jones;* for the California Association of Realtors et al. by *John E. Mueller, Marguerite Mary Leoni, Laurene K. Janik* and *William M. Pfeiffer;* for the Florida Manufactured Housing Association, Inc., by *Jack M. Skelding, Jr.;* for the Institute of Real Estate Management of the National Association of Realtors by *Jonathan T. Howe, Terrence Hutton,* and *Henry M. Schaffer;* for the Manufactured Housing Educational Trusts of Los Angeles County, California, et al. by *Jerrold A. Fadem, George Kimball, Charles S. Treat,* and *Kim N. A. Richards;* for the Manufactured Housing Educational Trust of Santa Clara County by *Robert K. Best;* for the Pacific Legal Foundation by *Ronald A. Zumbrun, Edward J. Connor, Jr.,* and *Timothy A. Bittle;* for the Rent Stabilization Association of New York City, Inc., et al. by *Erwin N. Griswold* and *Stephen J. Goodman;* for the Washington Legal Foundation et al. by *Daniel*

JUSTICE O'CONNOR delivered the opinion of the Court.

The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." Most of our cases interpreting the Clause fall within two distinct classes. Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation. See, *e. g., Loretto* v. *Teleprompter Manhattan CATV Corp.,* 458 U. S. 419, 426 (1982). But where the government merely regulates the use of property, compensation

*J. Popeo, Paul D. Kamenar,* and *Jonathan K. Van Patten;* and for the Western Mobilehome Association by *Michael A. Willemsen* and *David Spangenberg.*

Briefs of *amici curiae* urging affirmance were filed for the city of San Jose et al. by *Joan R. Gallo, George Rios, Manuela Albuquerque, Stanley C. Hatch, Glenn R. Watson, William Camil, Lynn R. McDougal, Scott H. Howard, David J. Erwin, Robert L. Kress, Charles J. Williams, David H. Hirsch, Steven F. Nord, Marc G. Hynes, John L. Cook, Daniel S. Hentschke, Gary L. Gillig, Jean Leonard Harris, David E. Schricker, Michael F. Dean, James Penman, Peter D. Bulens, John W. Witt, Louise H. Renne, James P. Botz, Mark G. Sellers, Robert B. Ewing, Angil P. Morris, James G. Rourke,* and *Thomas Haas;* for the American Association of Retired Persons by *Steven S. Zalesnick* and *Joan Wise;* for the city of Santa Monica et al. by *Robert M. Myers, Joseph Lawrence, Martin Tachiki, Barry Rosenbaum, David Pettit, Karl M. Manheim,* and *Shane Stark;* for the Golden State Mobilhome Owners League, Inc., et al. by *Fran M. Layton, Joseph L. Sax,* and *Bruce E. Stanton;* for the International City/County Management Association et al. by *Richard Ruda, Andrew G. Schultz, Edward Ricco, Charles K. Purcell,* and *James P. Bieg;* for the National Trust for Historic Preservation in the United States et al. by *Lloyd N. Cutler, Louis R. Cohen, David R. Johnson, Jerold S. Kayden,* and *Elizabeth S. Merritt;* and for the New Jersey Department of the Public Advocate by *David Ben-Asher.*

Briefs of *amici curiae* were filed for the Arizona Mobile Housing Association, Inc., by *Michael A. Parham;* for the California Mobile Home Parkowners Alliance by *Michael M. Berger* and *Joel G. Hirsch;* for the Escondido Mobilehome Owners' Positive Action Committee by *Richard I. Singer* and *Elvi J. Olesen;* and for the Manufactured Housing Association in New Jersey, Inc., by *Christopher J. Hanlon* and *Henry N. Portner.*

is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole. See, *e. g.,* *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104, 123–125 (1978). The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.

Petitioners own mobile home parks in Escondido, California. They contend that a local rent control ordinance, when viewed against the backdrop of California's Mobilehome Residency Law, amounts to a physical occupation of their property, entitling them to compensation under the first category of cases discussed above.

I

The term "mobile home" is somewhat misleading. Mobile homes are largely immobile as a practical matter, because the cost of moving one is often a significant fraction of the value of the mobile home itself. They are generally placed permanently in parks; once in place, only about 1 in every 100 mobile homes is ever moved. Hirsch & Hirsch, Legal-Economic Analysis of Rent Controls in a Mobile Home Context: Placement Values and Vacancy Decontrol, 35 UCLA L. Rev. 399, 405 (1988). A mobile home owner typically rents a plot of land, called a "pad," from the owner of a mobile home park. The park owner provides private roads within the park, common facilities such as washing machines or a swimming pool, and often utilities. The mobile home owner often invests in site-specific improvements such as a driveway, steps, walkways, porches, or landscaping. When the mobile home owner wishes to move, the mobile home is usually sold in place, and the purchaser continues to rent the pad on which the mobile home is located.

In 1978, California enacted its Mobilehome Residency Law, Cal. Civ. Code Ann. § 798 (West 1982 and Supp. 1991). The legislature found "that, because of the high cost of moving mobilehomes, the potential for damage resulting therefrom, the requirements relating to the installation of mobilehomes, and the cost of landscaping or lot preparation, it is necessary that the owners of mobilehomes occupied within mobilehome parks be provided with the unique protection from actual or constructive eviction afforded by the provisions of this chapter." § 798.55(a).

The Mobilehome Residency Law limits the bases upon which a park owner may terminate a mobile home owner's tenancy. These include the nonpayment of rent, the mobile home owner's violation of law or park rules, and the park owner's desire to change the use of his land. § 798.56. While a rental agreement is in effect, however, the park owner generally may not require the removal of a mobile home when it is sold. § 798.73. The park owner may neither charge a transfer fee for the sale, § 798.72, nor disapprove of the purchaser, provided that the purchaser has the ability to pay the rent, § 798.74. The Mobilehome Residency Law contains a number of other detailed provisions, but none limit the rent the park owner may charge.

In the wake of the Mobilehome Residency Law, various communities in California adopted mobile home rent control ordinances. See Hirsch & Hirsch, *supra*, at 408–411. The voters of Escondido did the same in 1988 by approving Proposition K, the rent control ordinance challenged here. The ordinance sets rents back to their 1986 levels and prohibits rent increases without the approval of the city council. Park owners may apply to the council for rent increases at any time. The council must approve any increases it determines to be "just, fair and reasonable," after considering the following nonexclusive list of factors: (1) changes in the Consumer Price Index; (2) the rent charged for comparable mobile home pads in Escondido; (3) the length of time since

the last rent increase; (4) the cost of any capital improvements related to the pad or pads at issue; (5) changes in property taxes; (6) changes in any rent paid by the park owner for the land; (7) changes in utility charges; (8) changes in operating and maintenance expenses; (9) the need for repairs other than for ordinary wear and tear; (10) the amount and quality of services provided to the affected tenant; and (11) any lawful existing lease. Ordinance § 4(g), App. 11–12.

Petitioners John and Irene Yee own the Friendly Hills and Sunset Terrace Mobile Home Parks, both of which are located in the city of Escondido. A few months after the adoption of Escondido's rent control ordinance, they filed suit in San Diego County Superior Court. According to the complaint, "[t]he rent control law has had the effect of depriving the plaintiffs of all use and occupancy of [their] real property and granting to the tenants of mobilehomes presently in The Park, as well as the successors in interest of such tenants, the right to physically permanently occupy and use the real property of Plaintiff." *Id.,* at 3, ¶ 6. The Yees requested damages of $6 million, a declaration that the rent control ordinance is unconstitutional, and an injunction barring the ordinance's enforcement. *Id.,* at 5–6.

In their opposition to the city's demurrer, the Yees relied almost entirely on *Hall* v. *Santa Barbara,* 833 F. 2d 1270 (CA9 1987), cert. denied, 485 U. S. 940 (1988), which had held that a similar mobile home rent control ordinance effected a physical taking under *Loretto* v. *Teleprompter Manhattan CATV Corp.,* 458 U. S. 419 (1982). The Yees candidly admitted that "in fact, the *Hall* decision was used [as] a guide in drafting the present Complaint." 2 Tr. 318, Points & Authorities in Opposition to Demurrer 4. The Superior Court nevertheless sustained the city's demurrer and dismissed the Yees' complaint. App. to Pet. for Cert. C–42.

The Yees were not alone. Eleven other park owners filed similar suits against the city shortly afterwards, and all were

dismissed. By stipulation, all 12 cases were consolidated for appeal; the parties agreed that all would be submitted for decision by the California Court of Appeal on the briefs and oral argument in the *Yee* case.

The Court of Appeal affirmed, in an opinion primarily devoted to expressing the court's disagreement with the reasoning of *Hall.* The court concluded: "*Loretto* in no way suggests that the Escondido ordinance authorizes a permanent physical occupation of the landlord's property and therefore constitutes a per se taking." 224 Cal. App. 3d 1349, 1358, 274 Cal. Rptr. 551, 557 (1990). The California Supreme Court denied review. App. to Pet. for Cert. B–41.

Eight of the twelve park owners, including the Yees, joined in a petition for certiorari. We granted certiorari, 502 U. S. 905 (1991), to resolve the conflict between the decision below and those of two of the Federal Courts of Appeals, in *Hall, supra,* and *Pinewood Estates of Michigan* v. *Barnegat Township Leveling Board,* 898 F. 2d 347 (CA3 1990).

## II

Petitioners do not claim that the ordinary rent control statutes regulating housing throughout the country violate the Takings Clause. Brief for Petitioners 7, 10. Cf. *Pennell* v. *San Jose,* 485 U. S. 1, 12, n. 6 (1988); *Loretto, supra,* at 440. Instead, their argument is predicated on the unusual economic relationship between park owners and mobile home owners. Park owners may no longer set rents or decide who their tenants will be. As a result, according to petitioners, any reduction in the rent for a mobile home pad causes a corresponding increase in the value of a mobile home, because the mobile home owner now owns, in addition to a mobile home, the right to occupy a pad at a rent below the value that would be set by the free market. Cf. Hirsch & Hirsch, 35 UCLA L. Rev., at 425. Because under the California Mobilehome Residency Law the park owner cannot evict a mo-

bile home owner or easily convert the property to other uses, the argument goes, the mobile home owner is effectively a perpetual tenant of the park, and the increase in the mobile home's value thus represents the right to occupy a pad at below-market rent indefinitely. And because the Mobile-home Residency Law permits the mobile home owner to sell the mobile home in place, the mobile home owner can receive a premium from the purchaser corresponding to this increase in value. The amount of this premium is not limited by the Mobilehome Residency Law or the Escondido ordinance. As a result, petitioners conclude, the rent control ordinance has transferred a discrete interest in land—the right to oc-cupy the land indefinitely at a submarket rent—from the park owner to the mobile home owner. Petitioners contend that what has been transferred from park owner to mobile home owner is no less than a right of physical occupation of the park owner's land.

This argument, while perhaps within the scope of our reg-ulatory taking cases, cannot be squared easily with our cases on physical takings. The government effects a physical tak-ing only where it *requires* the landowner to submit to the physical occupation of his land. "This element of required acquiescence is at the heart of the concept of occupation." *FCC* v. *Florida Power Corp.*, 480 U. S. 245, 252 (1987). Thus whether the government floods a landowner's property, *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166 (1872), or does no more than require the landowner to suffer the installation of a cable, *Loretto, supra,* the Takings Clause requires compen-sation if the government authorizes a compelled physical in-vasion of property.

But the Escondido rent control ordinance, even when con-sidered in conjunction with the California Mobilehome Resi-dency Law, authorizes no such thing. Petitioners voluntar-ily rented their land to mobile home owners. At least on the face of the regulatory scheme, neither the city nor the State compels petitioners, once they have rented their prop-

erty to tenants, to continue doing so. To the contrary, the Mobilehome Residency Law provides that a park owner who wishes to change the use of his land may evict his tenants, albeit with 6 or 12 months notice. Cal. Civ. Code Ann. § 798.56(g). Put bluntly, no government has required any physical invasion of petitioners' property. Petitioners' tenants were invited by petitioners, not forced upon them by the government. See *Florida Power, supra,* at 252–253. While the "right to exclude" is doubtless, as petitioners assert, "one of the most essential sticks in the bundle of rights that are commonly characterized as property," *Kaiser Aetna* v. *United States,* 444 U. S. 164, 176 (1979), we do not find that right to have been taken from petitioners on the mere face of the Escondido ordinance.

Petitioners suggest that the statutory procedure for changing the use of a mobile home park is in practice "a kind of gauntlet," in that they are not in fact free to change the use of their land. Reply Brief for Petitioners 10, n. 16. Because petitioners do not claim to have run that gauntlet, however, this case provides no occasion to consider how the procedure has been applied to petitioners' property, and we accordingly confine ourselves to the face of the statute. See *Keystone Bituminous Coal Assn.* v. *DeBenedictis,* 480 U. S. 470, 493–495 (1987). A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy. See *Florida Power, supra,* at 251–252, n. 6; see also *Nollan* v. *California Coastal Comm'n,* 483 U. S. 825, 831–832 (1987); *Fresh Pond Shopping Center, Inc.* v. *Callahan,* 464 U. S. 875, 877 (1983) (REHNQUIST, J., dissenting).

On their face, the state and local laws at issue here merely regulate petitioners' *use* of their land by regulating the relationship between landlord and tenant. "This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant rela-

tionship in particular without paying compensation for all economic injuries that such regulation entails." *Loretto*, 458 U. S., at 440. See also *Florida Power, supra*, at 252 ("statutes regulating the economic relations of landlords and tenants are not *per se* takings"). When a landowner decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge, see, *e. g., Pennell, supra*, at 12, n. 6, or require the landowner to accept tenants he does not like, see, *e. g., Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 261 (1964), without automatically having to pay compensation. See also *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 82–84 (1980). Such forms of regulation are analyzed by engaging in the "essentially ad hoc, factual inquiries" necessary to determine whether a regulatory taking has occurred. *Kaiser Aetna, supra*, at 175. In the words of Justice Holmes, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 415 (1922).

Petitioners emphasize that the ordinance transfers wealth from park owners to incumbent mobile home owners. Other forms of land use regulation, however, can also be said to transfer wealth from the one who is regulated to another. Ordinary rent control often transfers wealth from landlords to tenants by reducing the landlords' income and the tenants' monthly payments, although it does not cause a one-time transfer of value as occurs with mobile homes. Traditional zoning regulations can transfer wealth from those whose activities are prohibited to their neighbors; when a property owner is barred from mining coal on his land, for example, the value of his property may decline but the value of his neighbor's property may rise. The mobile home owner's ability to sell the mobile home at a premium may make this wealth transfer more *visible* than in the ordinary case, see Epstein, Rent Control and the Theory of Efficient Regulation, 54 Brooklyn L. Rev. 741, 758–759 (1988), but the exist-

ence of the transfer in itself does not convert regulation into physical invasion.

Petitioners also rely heavily on their allegation that the ordinance benefits incumbent mobile home owners without benefiting future mobile home owners, who will be forced to purchase mobile homes at premiums. Mobile homes, like motor vehicles, ordinarily decline in value with age. But the effect of the rent control ordinance, coupled with the restrictions on the park owner's freedom to reject new tenants, is to increase significantly the value of the mobile home. This increased value normally benefits only the tenant in possession at the time the rent control is imposed. See Hirsch & Hirsch, 35 UCLA L. Rev., at 430–431. Petitioners are correct in citing the existence of this premium as a difference between the alleged effect of the Escondido ordinance and that of an ordinary apartment rent control statute. Most apartment tenants do not sell anything to their successors (and are often prohibited from charging "key money"), so a typical rent control statute will transfer wealth from the landlord to the incumbent tenant and all future tenants. By contrast, petitioners contend that the Escondido ordinance transfers wealth only to the incumbent mobile home owner. This effect might have some bearing on whether the ordinance causes a *regulatory* taking, as it may shed some light on whether there is a sufficient nexus between the effect of the ordinance and the objectives it is supposed to advance. See *Nollan* v. *California Coastal Comm'n, supra,* at 834–835. But it has nothing to do with whether the ordinance causes a *physical* taking. Whether the ordinance benefits only current mobile home owners or all mobile home owners, it does not require petitioners to submit to the physical occupation of their land.

The same may be said of petitioners' contention that the ordinance amounts to compelled physical occupation because it deprives petitioners of the ability to choose their incoming

tenants.* Again, this effect may be relevant to a regulatory taking argument, as it may be one factor a reviewing court would wish to consider in determining whether the ordinance unjustly imposes a burden on petitioners that should "be compensated by the government, rather than remain[ing] disproportionately concentrated on a few persons." *Penn Central Transportation Co.* v. *New York City,* 438 U. S., at 124. But it does not convert regulation into the unwanted physical occupation of land. Because they voluntarily open their property to occupation by others, petitioners cannot assert a *per se* right to compensation based on their inability to exclude particular individuals. See *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S., at 261; see also *id.,* at 259 ("[A]ppellant has no 'right' to select its guests as it sees fit, free from governmental regulation"); *Prune-Yard Shopping Center* v. *Robins,* 447 U. S., at 82–84.

Petitioners' final line of argument rests on a footnote in *Loretto,* in which we rejected the contention that "the landlord could avoid the requirements of [the statute forcing her to permit cable to be permanently placed on her property] by ceasing to rent the building to tenants." We found this possibility insufficient to defeat a physical taking claim, because "a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." *Loretto,* 458 U. S., at 439, n. 17. Petitioners argue that if they have to leave the mobile home park business in order to avoid the strictures of the Escondido

---

*Strictly speaking, the Escondido rent control ordinance only limits rents. Petitioners' inability to select their incoming tenants is a product of the State's Mobilehome Residency Law, the constitutionality of which has never been at issue in this case. (The State, moreover, has never been a party.) But we understand petitioners to be making a more subtle argument—that before the adoption of the ordinance they were able to influence a mobile home owner's selection of a purchaser by threatening to increase the rent for prospective purchasers they disfavored. To the extent the rent control ordinance deprives petitioners of this type of influence, petitioners' argument is one we must consider.

ordinance, their ability to rent their property has in fact been conditioned on such a forfeiture. This argument fails at its base, however, because there has simply been no compelled physical occupation giving rise to a right to compensation that petitioners could have forfeited. Had the city required such an occupation, of course, petitioners would have a right to compensation, and the city might then lack the power to condition petitioners' ability to run mobile home parks on their waiver of this right. Cf. *Nollan* v. *California Coastal Comm'n*, 483 U. S., at 837. But because the ordinance does not effect a physical taking in the first place, this footnote in *Loretto* does not help petitioners.

With respect to physical takings, then, this case is not far removed from *FCC* v. *Florida Power Corp.*, 480 U. S. 245 (1987), in which the respondent had voluntarily leased space on its utility poles to a cable television company for the installation of cables. The Federal Government, exercising its statutory authority to regulate pole attachment agreements, substantially reduced the annual rent. We rejected the respondent's claim that "it is a taking under *Loretto* for a tenant invited to lease at a rent of $7.15 to remain at the regulated rent of $1.79." *Id.*, at 252. We explained that "it is the invitation, not the rent, that makes the difference. The line which separates [this case] from *Loretto* is the unambiguous distinction between a . . . lessee and an interloper with a government license." *Id.*, at 252–253. The distinction is equally unambiguous here. The Escondido rent control ordinance, even considered against the backdrop of California's Mobilehome Residency Law, does not authorize an unwanted physical occupation of petitioners' property. It is a regulation of petitioners' *use* of their property, and thus does not amount to a *per se* taking.

### III

In this Court, petitioners attempt to challenge the ordinance on two additional grounds: They argue that it constitutes a denial of substantive due process and a regulatory

taking. Neither of these claims is properly before us. The first was not raised or addressed below, and the second is not fairly included in the question on which we granted certiorari.

## A

The Yees did not include a due process claim in their complaint. Nor did petitioners raise a due process claim in the Court of Appeal. It was not until their petition for review in the California Supreme Court that petitioners finally raised a substantive due process claim. But the California Supreme Court denied discretionary review. Such a denial, as in this Court, expresses no view as to the merits. See *People* v. *Triggs*, 8 Cal. 3d 884, 890–891, 506 P. 2d 232, 236 (1973). In short, petitioners did not raise a substantive due process claim in the state courts, and no state court has addressed such a claim.

In reviewing the judgments of state courts under the jurisdictional grant of 28 U. S. C. § 1257, the Court has, with very rare exceptions, refused to consider petitioners' claims that were not raised or addressed below. *Illinois* v. *Gates*, 462 U. S. 213, 218–220 (1983). While we have expressed inconsistent views as to whether this rule is jurisdictional or prudential in cases arising from state courts, see *ibid.*, we need not resolve the question here. (In cases arising from federal courts, the rule is prudential only. See, *e. g.*, *Carlson* v. *Green*, 446 U. S. 14, 17, n. 2 (1980).) Even if the rule were prudential, we would adhere to it in this case. Because petitioners did not raise their substantive due process claim below, and because the state courts did not address it, we will not consider it here.

## B

As a preliminary matter, we must address respondent's assertion that a regulatory taking claim is unripe because petitioners have not sought rent increases. While respondent is correct that a claim that the ordinance effects a regula-

tory taking *as applied* to petitioners' property would be unripe for this reason, see *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City,* 473 U. S. 172, 186–197 (1985), petitioners mount a *facial* challenge to the ordinance. They allege in this Court that the ordinance does not " 'substantially advance' " a " 'legitimate state interest' " no matter how it is applied. See *Nollan* v. *California Coastal Comm'n, supra,* at 834; *Agins* v. *Tiburon,* 447 U. S. 255, 260 (1980). As this allegation does not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property or the extent to which these particular petitioners are compensated, petitioners' facial challenge is ripe. See *Keystone Bituminous Coal Assn.* v. *DeBenedictis,* 480 U. S., at 495; *Agins, supra,* at 260.

We must also reject respondent's contention that the regulatory taking argument is not properly before us because it was not made below. It *is* unclear whether petitioners made this argument below: Portions of their complaint and briefing can be read either to argue a regulatory taking or to support their physical taking argument. For the same reason it is equally ambiguous whether the Court of Appeal addressed the issue. Yet petitioners' regulatory taking argument stands in a posture different from their substantive due process claim.

Petitioners unquestionably raised a taking claim in the state courts. The question whether the rent control ordinance took their property without compensation, in violation of the Fifth Amendment's Takings Clause, is thus properly before us. Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below. *Bankers Life & Casualty Co.* v. *Crenshaw,* 486 U. S. 71, 78, n. 2 (1988); *Gates, supra,* at 219–220; *Dewey* v. *Des Moines,* 173 U. S. 193, 197–198 (1899). Petitioners' arguments that the ordinance constitutes a taking in two differ-

ent ways, by physical occupation and by regulation, are not separate *claims*. They are, rather, separate *arguments* in support of a single claim—that the ordinance effects an unconstitutional taking. Having raised a taking claim in the state courts, therefore, petitioners could have formulated any argument they liked in support of that claim here.

A litigant seeking review in this Court of a claim properly raised in the lower courts thus generally possesses the ability to frame the question to be decided in any way he chooses, without being limited to the manner in which the question was framed below. While we have on occasion rephrased the question presented by a petitioner, see, *e. g.,* *Ankenbrandt* v. *Richards*, 502 U. S. 1023 (1992), or requested the parties to address an important question of law not raised in the petition for certiorari, see, *e. g., Payne* v. *Tennessee*, 498 U. S. 1080 (1991), by and large it is the petitioner himself who controls the scope of the question presented. The petitioner can generally frame the question as broadly or as narrowly as he sees fit.

The framing of the question presented has significant consequences, however, because under this Court's Rule 14.1(a), "[o]nly the questions set forth in the petition, or fairly included therein, will be considered by the Court." While "[t]he statement of any question presented will be deemed to comprise every subsidiary question fairly included therein," *ibid.*, we ordinarily do not consider questions outside those presented in the petition for certiorari. See, *e. g., Berkemer* v. *McCarty*, 468 U. S. 420, 443, n. 38 (1984). This rule is prudential in nature, but we disregard it "only in the most exceptional cases," *Stone* v. *Powell*, 428 U. S. 465, 481, n. 15 (1976), where reasons of urgency or of economy suggest the need to address the unpresented question in the case under consideration.

Rule 14.1(a) serves two important and related purposes. First, it provides the respondent with notice of the grounds upon which the petitioner is seeking certiorari, and enables

the respondent to sharpen the arguments as to why certiorari should not be granted. Were we routinely to consider questions beyond those raised in the petition, the respondent would lack any opportunity in advance of litigation on the merits to argue that such questions are not worthy of review. Where, as is not unusual, the decision below involves issues on which the petitioner does *not* seek certiorari, the respondent would face the formidable task of opposing certiorari on every issue the Court might conceivably find present in the case. By forcing the petitioner to choose his questions at the outset, Rule 14.1(a) relieves the respondent of the expense of unnecessary litigation on the merits and the burden of opposing certiorari on unpresented questions.

Second, Rule 14.1(a) assists the Court in selecting the cases in which certiorari will be granted. Last Term alone we received over 5,000 petitions for certiorari, but we have the capacity to decide only a small fraction of these cases on the merits. To use our resources most efficiently, we must grant certiorari only in those cases that will enable us to resolve particularly important questions. Were we routinely to entertain questions not presented in the petition for certiorari, much of this efficiency would vanish, as parties who feared an inability to prevail on the question presented would be encouraged to fill their limited briefing space and argument time with discussion of issues other than the one on which certiorari was granted. Rule 14.1(a) forces the parties to focus on the questions the Court has viewed as particularly important, thus enabling us to make efficient use of our resources.

We granted certiorari on a single question pertaining to the Takings Clause: "Two federal courts of appeal have held that the transfer of a premium value to a departing mobile-home tenant, representing the value of the right to occupy at a reduced rate under local mobilehome rent control ordinances, constitute[s] an impermissible taking. Was it error for the state appellate court to disregard the rulings and

hold that there was no taking under the fifth and fourteenth amendments?" This was the question presented by petitioners. Pet. for Cert. i. It asks whether the court below erred in disagreeing with the holdings of the Courts of Appeals for the Third and Ninth Circuits in *Pinewood Estates of Michigan* v. *Barnegat Township Leveling Board,* 898 F. 2d 347 (CA3 1990), and *Hall* v. *Santa Barbara,* 833 F. 2d 1270 (CA9 1987), cert. denied, 485 U. S. 940 (1988). These cases, in turn, held that mobile home ordinances effected physical takings, not regulatory takings. Fairly construed, then, petitioners' question presented is the equivalent of the question "Did the court below err in finding no physical taking?"

Whether or not the ordinance effects a regulatory taking is a question *related* to the one petitioners presented, and perhaps *complementary* to the one petitioners presented, but it is not "fairly included therein." Consideration of whether a regulatory taking occurred would not assist in resolving whether a physical taking occurred as well; neither of the two questions is subsidiary to the other. Both might be subsidiary to a question embracing both—Was there a taking?—but they exist side by side, neither encompassing the other. Cf. *American Nat. Bank & Trust Co. of Chicago* v. *Haroco, Inc.,* 473 U. S. 606, 608 (1985) (question whether complaint adequately alleges conduct of racketeering enterprise is not fairly included in question whether statute requires that plaintiff suffer damages through defendant's conduct of such an enterprise).

Rule 14.1(a) accordingly creates a heavy presumption against our consideration of petitioners' claim that the ordinance causes a regulatory taking. Petitioners have not overcome that presumption. While the regulatory taking question is no doubt important, from an institutional perspective it is not as important as the physical taking question. The lower courts have not reached conflicting results, so far as we know, on whether similar mobile home rent

control ordinances effect regulatory takings. They *have* reached conflicting results over whether such ordinances cause physical takings; such a conflict is, of course, a substantial reason for granting certiorari under this Court's Rule 10. Moreover, the conflict is between two courts whose jurisdiction includes California, the State with the largest population and one with a relatively high percentage of the Nation's mobile homes. Forum shopping is thus of particular concern. See *Azul Pacifico, Inc.* v. *Los Angeles,* 948 F. 2d 575, 579 (CA9 1991) (mobile home park owners may file physical taking suits in either state or federal court). Prudence also dictates awaiting a case in which the issue was fully litigated below, so that we will have the benefit of developed arguments on both sides and lower court opinions squarely addressing the question. See *Lytle* v. *Household Mfg., Inc.,* 494 U. S. 545, 552, n. 3 (1990) ("Applying our analysis . . . to the facts of a particular case without the benefit of a full record or lower court determinations is not a sensible exercise of this Court's discretion"). In fact, were we to address the issue here, we would apparently be the first court in the Nation to determine whether an ordinance like this one effects a regulatory taking. We will accordingly follow Rule 14.1(a), and consider only the question petitioners raised in seeking certiorari. We leave the regulatory taking issue for the California courts to address in the first instance.

## IV

We made this observation in *Loretto:*

"Our holding today is very narrow. We affirm the traditional rule that a permanent physical occupation of property is a taking. In such a case, the property owner. entertains a historically rooted expectation of compensation, and the character of the invasion is qualitatively more intrusive than perhaps any other category of property regulation. We do not, however, question the equally substantial authority upholding a State's

broad power to impose appropriate restrictions upon an owner's *use* of his property." 458 U. S., at 441.

We respected this distinction again in *Florida Power*, where we held that no taking occurs under *Loretto* when a tenant invited to lease at one rent remains at a lower regulated rent. *Florida Power*, 480 U. S., at 252–253. We continue to observe the distinction today. Because the Escondido rent control ordinance does not compel a landowner to suffer the physical occupation of his property, it does not effect a *per se* taking under *Loretto.* The judgment of the Court of Appeal is accordingly

*Affirmed.*

JUSTICE BLACKMUN, concurring in the judgment.

I agree with the Court that the Escondido ordinance is not a taking under this Court's analysis in *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419 (1982). I also conclude that the substantive due process and regulatory taking claims are not properly raised in this Court. For that reason, I, unlike the Court, do not decide whether the regulatory taking claim is or is not ripe, or which of petitioners' arguments would or would not be relevant to such a claim.

JUSTICE SOUTER, concurring in the judgment.

I concur in the judgment and would join the Court's opinion except for its references to the relevance and significance of petitioners' allegations to a claim of regulatory taking.