McHugh, J.
I. BACKGROUND
This is an action in which plaintiff, Benedict F. Fitzgerald, Jr., (“Fitzgerald”), Trustee of the Tara Ware Street Trust, seeks review of, and declaratory relief concerning, a ruling of the defendant, Cambridge Rent Control Board (“Board”), denying his application for an Initial Removal Permit (“Permit”) and granting to him instead a Conditional Removal Permit. Review is sought pursuant to St. 1976, c. 36, §10 as amended by St. 1985, c. 399 and pursuant to G.L.c. 30A, §14.
Plaintiff alleges, in essence, that the Board took improper administrative notice of Board findings in an earlier case, acted in an arbitrary and capricious manner in denying his request for an unconditional removal permit and, by denying that request, exceeded its authority. Finally, plaintiff alleges that the Board’s action violates the Massachusetts Constitution, Part I, Articles I and X, and the Fifth Amendment to the Constitution of the United States because that action amounts to a “taking” of his property without just compensation and also violates the ban on involuntary servitude contained in the Thirteenth Amendment to the Constitution of the United States.
Based on the claimed errors and improprieties, plaintiff asks the Court to declare that the Cambridge Rent Control Ordinance is, in part at least, unconstitutional, to reverse the Board’s denial of his permit application and to order the Board to issue a permit without any conditions or, at the least, to order the Board to hold a rehearing on plaintiffs application for a permit.
The case came on for a hearing on the administrative record. A brief statement of the circumstances surrounding the administrative proceedings as well as the Board’s findings is helpful to put plaintiffs claims in their proper perspective.
II. PRIOR PROCEEDINGS
The administrative record reveals that Fitzgerald is the Trustee of the Tara Ware Street Trust (“the Trust”). The Trust owns a building at 25 Ware Street in Cambridge, Massachusetts. Plaintiff, his wife and his daughter are the beneficiaries of the Trust. Twenty-five Ware Street is a three-stoiy brick structure with four rooms on the third floor and three rooms on the second floor. Although plaintiff alleges that the building is a single-family house, the Board found in an earlier proceeding that the building is instead a five-unit, rent-controlled lodging house because plaintiff had been renting out rooms to individual tenants for a number of years. That ruling was affirmed on appeal in the Cambridge District Court and is now on appeal in the Appeals Court.
Approximately two years ago, plaintiff decided to occupy the building as a single-family dwelling and to stop renting any units in the building to others. Accordingly, he applied to the Board for a permit for “removal” of the four lodging units from rent control as required by the Cambridge Rent Control Ordinance (“the Ordinance”). The Ordinance is found in Chapter 8.44 of the Cambridge Municipal Code and, in pertinent part, says that “[n]o owner . . . shall remove from the market any controlled rental unit, unless the Board after a hearing grants a permit.” Ordinance, §8.44-040(A). The Ordinance goes on to say that the following acts are included in the definition of “removal from the market:”
5. Cause a unit, not the primary residence of a legal unit owner, to be vacant for one hundred twenty days or more or by refusing to rent or to offer to rent such unit in good faith . . . The existence of a vacancy for one hundred twenty days or more, *498 without a showing of good cause, shall constitute removal from the market.
6. “Removal from the market” does not include occupancy of a non-condominium unit by the owner of the building in which it is located or by any member of his/her immediate family.
Ordinance, §§8.44.020(D)(5), 8.44.020(D)(6).
The plaintiffs application for a removal permit came on for a hearing before a hearing examiner on April 22, 1992. The examiner took administrative notice of the hearing examiner’s findings and recommendations in the earlier proceedings in which plaintiff was found to be operating a lodging house. Record at 27-29. Ultimately, and in reliance on those earlier findings, the examiner found, among other things, that
1. [Plaintiffs) building is a five-unit rent controlled lodging house consisting of one dwelling unit which includes four rooming units on the third floor.
3. The four units on the third floor have been rented as rooming units for at least the past ten years.
5. While [plaintiff! alleges that he occupies the second floor with his wife and daughter who is thiriy years old, there is insufficient credible evidence to support such a finding . . .
Record at 95.
The examiner also found that loss of the rental units in plaintiffs building resulting from a “reconversion” of the building to a single-family dwelling would “aggravate the shortage of decent rental housing," in Cambridge. Record at 98. Accordingly, the examiner recommended that the Board deny plaintiffs request for a removal permit. On August 12, 1992, plaintiff filed objections to the examiner’s report, including objections based on constitutional grounds.
On November 9, 1992, the Board affirmed the examiner’s findings but modified his recommendation. In pertinent part, the modification is embodied in the following portions of the Board’s decision:
[T]he Board voted to grant (plaintiff) a temporary removal permit so that he may occupy the subject property as a single-family house so long as he lives there.
The Board further voted to grant [plaintiff] a conditional removal permit for two of the four rooming units on the third floor. This ruling is expressly conditioned on the other two rooming units remaining subject to the provisions of the Rent Control Act, notwithstanding owner-occupancy of the building.
In granting this relief, the Board found that its ruling . . . releases the owner from any obligation to apply for a lodging house license or to install costly secondary egress from the third floor.
This ruling which applies to all successor owners, shall be recorded in the Middlesex Registry of Deeds.
Record at 8. While conceivable arguments to the contrary may be made,[1] the Board’s order thus permitted the plaintiff to use the building as a single-family dwelling on the condition that two of the units on the fourth floor, at least, would be and remain subject to the provisions of the Ordinance after plaintiff himself stopped living there.[2]
On November 25, 1992, plaintiff requested a rehearing, claiming various errors. The Board denied that request on December 1, 1992 and plaintiff thereupon sought judicial review.
III. DISCUSSION A. STATUTORY CLAIMS
Section 10(a) of the Ordinance, St. 1976, c. 36, provides that judicial review of Board decisions shall be conducted in accordance with the provisions of the Administrative Procedures Act, G.L.c. 30A, §14. In pertinent part, §14 permits the court to set aside or modify a decision, or to remand a decision to an administrative body for further proceedings, if the court determines that the “substantial rights of any party may have been prejudiced because the agency decision is . . . arbitrary or capricious, an abuse of discretion or otherwise not in accordance with the law.”
The Board’s decision here was not arbitrary, was not capricious and it was not devoid of support in the administrative record. The Board’s finding that plaintiffs building is a five-unit rent-controlled lodging house is based on an earlier proceeding between the same parties that resulted in a final administrative order and final judgment in the district court. That judgment prohibits plaintiff from relitigating in subsequent administrative proceedings facts established in the earlier proceeding. E.g., Brunson v. Wall, 405 Mass. 446, 448-50 (1989).
The hearing examiner properly took administrative notice of the earlier proceeding. Indeed, plaintiff made no objection when the examiner was asked to do so. Record at 27-29. See Record at 31-32. Even if an objection had been made, the examiner properly could have taken notice of those earlier proceedings. Courts are free to take judicial notice of papers and the contents of papers in related proceedings. E.g., Culhane v. Foley, 305 Mass. 542, 543 (1940); Flynn v. Brassard, 1 Mass.App.Ct. 678, 681 (1974). Administrative agencies may take notice of any facts courts may notice. Board of Assessors of Boston v. Ogden Suffolk Downs, Inc., 398 Mass. 604, 605 (1986).
Finally, the Board had broad discretion to interpret and enforce the ordinance and deference, albeit not infinite, must be given to the Board’s interpretation of that ordinance. E.g., Polednak v. Rent Control Board of Cambridge, 397 Mass. 854, 858 (1986). On the administrative record, the Board would have been warranted in denying the removal permit in its entirety. That being the case, a conditional denial was well within the Board’s power. Fragopoulos v. Rent Control Board of Cambridge, 408 Mass. 302, 304 (1990). Plaintiffs statutory and regulatory claims, therefore, are unpersuasive.
*499 B. CONSTITUTIONAL CLAIMS 1.Substantive Due Process
Plaintiffs first constitutional argument is that the Board’s decision impermissibly impinges on and restricts the activities he may undertake within the con-iines of his single-family dwelling. Citing Moore v. City of East Cleveland, 431 U.S. 494 (1977), a case which held that the Constitution places a brake on the ability of a municipality to define and regulate the congregate living arrangements of unrelated individuals in a single-family dwelling, he maintains, in effect, that the Constitution prohibits a municipality from forcing him to take unwanted strangers into his single-family dwelling.
The chief difficulty with plaintiffs argument is its premise. His is not a single-family dwelling. It is instead a lodging house.[3] Cases dealing with barriers the Constitution has erected around single-family dwellings thus have scant applicability to plaintiffs residence. His due process claim has no substance.
2.Involuntary Servitude
Plaintiffs next claim is that the Board’s decision requiring him to rent portions of his property against his will constitutes the kind of “involuntary servitude” prohibited by the Thirteenth Amendment to the Constitution of the United States and made applicable to the states by the Fourteenth. Of course, the order does not require plaintiff to do anything. Instead, and as stated earlier, the order specifically states that he may occupy the building as a single-family residence.
Moreover, even if the order could be viewed as requiring plaintiff to rent to others at a time when he would prefer not to, the order would not implicate the Thirteenth Amendment. Although no Massachusetts court has considered the issue, New York appellate courts, in persuasive opinions, have considered and rejected the contention plaintiff makes here. In Sobel v. Higgins, 573 N.Y.S.2d 1000, 1004 (Sup. Ct. 1991), the court dismissed a landlord’s Thirteenth Amendment challenge to New York City’s rent control law and regulations. Similarly, in Dawson v. Higgins, 588 N.Y.S.2d 93, 95 (Sup. Ct. 1992), the court rejected a similar Thirteenth Amendment challenge stating that the case “involved only property relations,” and that even a finding of an uncompensated “taking” would not amount to “legally enforceable servitude for the plaintiffs or [diminution of] their personal status, dignity [or] freedom.” Id. at 95-96.
Those conclusions are equally applicable here. An order requiring an individual to continue running a lodging house simply does not amount to “involuntary servitude” of the type the Thirteenth Amendment was designed to prohibit if, indeed, it amounts to an “involuntary servitude” at all.
3.Taking Without Just Compensation
Plaintiffs “taking” claims pose more difficult problems. At bottom, the Board’s order requires plaintiffs successors to surrender control over a portion of the property and to allow strangers to occupy the surrendered portion. At present, plaintiffs house is not occupied, permanently or temporarily, by any individuals other than members of his own family and he has a right to keep it that way. The Board’s order, however, means that his successors will not have that freedom after he leaves. Plaintiff claims that that loss of freedom amounts to a taking for which he is entitled to compensation.
The Fifth Amendment to the Constitution of the United States provides in relevant part that no person shall
be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation.
Part I, Articles I and X of the Massachusetts Constitution provide in relevant part that
[a]ll people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned . . . that of acquiring, possessing and protecting property . . .
. . . Whenever the public exigency requires that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefore.
Plaintiffs claim that the Board’s action amounts to a taking for which compensation is required under the Constitutions is grounded in the “per se takings” doctrine established in Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982). There, the Supreme Court of the United States held that a New York statute requiring building owners to allow installation of television cables in, on and through their buildings was an order requiring a “permanent physical occupation of properly,” and thus a “taking” requiring compensation under the Fifth Amendment. Id. at 441.
Relying on its analysis in the earlier decision of Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978), the Court distinguished cases involving government regulation of an owner’s use of his or her property in order to promote the public interest from cases in which governmental action mandated or allowed a permanent physical occupation of the property. In the former situations, the Court said, a factual analysis was required to determine whether a taking had occurred, a factual analysis including an assessment of the regulation’s economic impact on the properly and on the property owner’s “investment-backed expectations.” Loretto v. Teleprompter Manhattan CATV Corp., supra, 458 U.S. at 426.
Where governmental action resulted in a permanent physical occupation of property, however, the Court observed that it had “invariably found a taking.” Id. at 427. Announcing the “per se taking” doctrine, the Court said that
[a] permanent physical occupation is a government action of such a unique character that it is a taking *500 without regard to other factors that a court might ordinarily examine.
Id. at 432. See also, id. at 426. The Court continued by explaining why it focused so specifically on the “unique character” of a physical occupation:
[A] permanent physical occupation of another’s property ... is perhaps the most serious form of invasion of an owner’s property interests . . . [T]he government does not simply take a “strand” from the “bundle” of properly rights; it chops through the bundle, taking a slice of every strand.
. . . The power to exclude has traditionally been considered one of the most treasured strands in an owner’s bundle of property rights.
... [A]n owner suffers a special kind of injury when a stranger directly invades and occupies the owner’s property . . . [S]uch an occupation is qualitatively more severe than a regulation of the use of the property. . .
Id. at 435-36 (citations omitted) (emphasis in original).
The Court was, however, careful to note that unless a physical taking had occurred, its decision in Loretto was not intended to undermine the government’s authority to regulate relationships between landlords and tenants:
This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails.
So long as these regulations do not require the landlord to suffer the physical occupation of a portion of his building by a third party, they will be analyzed under the multiinquiry generally applicable to nonpossessory governmental activity.
Id. at 440 (citations omitted).
Ten years later, in April of 1992, the Court issued its opinion in Yee v. City of Escondido, 503 U.S._, 112 S.Ct. 1522 (1992). There at issue was the propriety of a municipal regulation affecting trailer parks. Among other things, the regulation limited the circumstances upon which a trailer-park owner could terminate a trailer-park tenancy. Under the ordinance, one permissible ground for termination of a tenancy was the park-owner’s desire to change his or her use of the property. Another was the tenants’ failure to pay rent, although the ordinance also rolled rents back to their level of several years earlier and prohibited rent increases without municipal approval.
Assessing the impact of that regulation, the Court concluded that no physical taking had occurred. As the Court, writing through Justice O’Connor, noted,
Neither the City nor the State compels petitioners, once they have rented their property to tenants, to continue doing so. To the contrary, the [ordinance] provides that a park owner who wishes to change the use of his land may evict his tenants, albeit with six or twelve months notice . . . Put bluntly, no government has required any physical invasion of petitioner’s property.
Id. at 1528.
Important for present purposes, however, is a caveat that the Court inserted following that discussion. “A different case,” the Court said
would be presented where the statute, on its face or as applied, [compelled] a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy. See [FCC v.] Florida Power [Corp.l 480 U.S. 245, 251-52, n.6 [(1987)]; see also Nollan v. California Coastal Comm’n, 483 U.S. 825, 831-32 (1987); Fresh Pond Shopping Center, Inc. v. Callahan, 464 U.S. 875, 877 (1983) (Rhenquist, J., dissenting).
Id. at 1529.[4]
The three cases cited by the court are important for understanding the caveat itself. The Florida Power case involved a claim by a utility company that an FCC order regulating the rates it could charge cable companies for attaching their cables to the Power Company’s utility poles amounted to a per se taking. The Court held that it did not. In so holding, the Court observed that the utility, not the FCC, had invited the cable companies to make the pole attachments, albeit at a higher rental than the FCC order permitted. That was dispositive for, as the Court put it, “it is the invitation, not the rent, that makes the difference. The line which separates [this case] from Loretto is the unambiguous distinction between a commercial lessee and an interloper with a government license.” FCC v. Florida Power Corp., 480 U.S. 245, 251-53 (1987). And in the footnote cited by the Court in Yee, the Court said that it was expressing no opinion on the result that would obtain if the FCC purported to require the utility to allow the cable companies to attach cables to its poles. Id. at 251-52 n.6.
In Nollan v. California Coastal Comm’n, 483 U.S. 825 (1987), the second of the two cases cited in the Yee caveat, the Coastal Commission, which had regulatory authority over beachfront property, permitted a property owner to rebuild a home that had deteriorated over the years but conditioned the permit on the property owner’s allowing members of the public to use his property as a means of access to the beach. The owner claimed that that requirement amounted to a taking for which they were entitled to compensation. The Court agreed. As the Court put it,
[w]e think a “permanent physical occupation” has occurred, for purposes of [the] rule [that “permanent physical occupations” amounts to takings, per se], where individuals are given a permanent and continuous right to pass to and from, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises.
Id. at 832.
*501 Finally, Fresh Pond Shopping Center, Inc. v. Callahan, 464 U.S. 875 (1983) (Rhenquist, J., dissenting), was simply an order dismissing for want of a substantial federal question an appeal from the Supreme Judicial Court’s decision in Fresh Pond Shopping Center, Inc. v. Rent Control Board of Cambridge, 388 Mass. 1051, 446 N.E.2d 1060 (1983). There, without opinion and by an equally divided court, the Supreme Judicial Court affirmed a judgment of the Superior Court which, in turn, affirmed a decision of the Cambridge Rent Control Board. The Board’s decision denied a removal permit to the owner of a six-unit apartment building who had sought to demolish the building and turn the property into a parking lot. At the time the owner sought the removal permit, only one of the six units was occupied by a tenant.
Dissenting from dismissal of the appeal, Justice Rhenquist viewed the scheme’s impact as a “per se” taking. As he put it,
the Rent Control Board has determined that until the remaining tenant decides to leave, appellant will be unable to vacate and demolish the building. In my view this deprives appellant of the use of its properly in a manner closely analogous to a permanent physical invasion, like that involved in Loretto.. .
Id. at 877. Continuing, Justice Rhenquist stated:
Though no issue is raised here that the rent paid by the tenant is insufficient, that fact does not end the inquiry. What has taken place is a transfer of control over the reversionary interest retained by appellant. This power to exclude is “one of the most treasured strands in an owner’s bundle of property rights, . . . [because] even though the owner may retain the bare legal right to dispose of the occupied space by transfer or sale, the permanent occupation of that space by a stranger would ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property.
Id. at 878.[5]
Decided Massachusetts cases do not answer squarely the question this case poses nor have they met, head on, application of Loretto to facts like those present here. The constitutionality of the removal provisions of the Cambridge Rent Control Ordinance was upheld in Flynn v. City of Cambridge, 383 Mass. 152, 160 (1981). Flynn, however, was decided one year before Loretto and the Court proceeded on a theory of “regulatory taking” involving the kind of balancing described in Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978).
After Loretto, the Supreme Judicial Court decided Polednak v. Rent Control Board of Cambridge, 397 Mass. 854 (1986), and Fragopoulos v. Rent Control Board of Cambridge, 408 Mass. 302 (1990). In Polednak, the question was whether applying the Ordinance and regulations in such a way as to prevent a tenant from living in a unit she bought for her own residential use at a time she was living there as a tenant. The court found it unnecessary to reach the constitutional questions because it found that the Ordinance and regulations did not permit the prohibition the Board sought. It noted, however, the constitutional difficulties lurking just behind its exercise in regulatory construction:
In this case the plaintiff purchased with the reasonable belief that she was entitled to buy her unit and continue to live in it. The board would physically exclude her from living in her unit as owner, and would require that the unit be made available for physical occupation by a tenant. If the board were to exclude her from her property in this way, there would be a taking for which she would be entitled to just compensation.
Polednak v. Rent Control Board of Cambridge, 397 Mass. 854, 862 (1986).
In Fragopoulos, the landowner sought a removal permit so that he could combine two of his four rental units into a single unit for his own occupancy. He proposed to continue leasing the remaining two units to others. In issuing the permit, the Board gave him permission to cany out his plan but also ordered that the building revert to its four-unit status when he sold the property unless the purchaser agreed to use the two rental units in the same manner. The Court distinguished Loretto stating that “the nature of the Board’s action was far from a physical invasion and occupation of [appellant’s] property.” Fragopoulos v. Rent Control Board of Cambridge, 408 Mass. 302, 309 (1990).
Finally, in Steinbergh v. City of Cambridge, (Steinberg II), 413 Mass. 736 (1992), cert. denied 113 S. Ct. 2338 (1993), the Supreme Judicial Court held that a delay in the sale of property caused by a Board order issued under an invalid portion of the Rent Control Ordinance did not amount to a “regulatory taking.” Id. at 741. The owners in Steinbergh however, had not asserted that the order produced a physical invasion of the type described in Loretto had occurred.[6]
In sum, no decided Massachusetts case has presented the kind of situation this case presents. Here, most starkly put, a property owner seeks to withdraw entirely from the business of renting his property to others and seeks to use his property solely for himself and his family. The Board has said that he cannot do so and that the property must be available, at least in the future, for rental to others. The question is whether that order amounts to a physical taking of the type Loretto says is impermissible absent just compensation.
Although the Massachusetts courts have not addressed that question definitively, the courts of New York have come much closer. In Seawall Associates v. City of New York, 74 N.Y.2d 92 (1989), cert. denied sub nom. Wilkerson v. Seawall Associates, 493 U.S. 976 (1989), the Court applied the Loretto doctrine in concluding that a New York City ordinance requiring *502 owners of certain buildings to rent out all vacant units was a “taking" that required compensation to the building owners.
The plaintiffs in Seawall were real estate developers who had purchased low rent “single room occupancy” (SRO) buildings in order to convert them to higher-priced units. They challenged a city moratorium on demolition, alteration or conversion of SRO properties that also obligated them to “rehabilitate and make habitable every SRO unit in their buildings, and lease every unit to a ‘bona fide’ tenant at controlled rents.” Id. at 100. The ordinance established penalties for non-compliance including a $150,000 fine for “each dwelling unlawfully altered, converted or demolished,” an additional $45,000 per unit for “reducing the total number of units,” and an additional $500 per unit for each unit “unrented to a bona fide tenant.” Id. Under the ordinance, building owners could buy their way out of their obligations for $45,000 per unit or the cost of a replacement unit or by providing an equal number of replacement units. Id. at 100-01. The moratorium was initially designed to last for eighteen months but was then extended for five years with the potential for unlimited future renewals. Id. at 99-100.
In holding that the so-called “rent-up” provisions of the ordinance amounted to a compensable taking, the New York Court of Appeals observed as follows:
Where, as here, owners are forced to accept the occupation of their properties by persons not already in residence, the resulting deprivation of rights in those properties is sufficient to constitute a physical taking for which compensation is required.
Id. at 103. Continuing, the Court stated that
(i]t is the forced occupation by strangers under the rent-up provisions of the law... which deprives the owners of their possessory interests and results in physical takings.
Id. at 106. The Court distinguished other cases where rent control laws had been upheld because “those regulations did not force the owners in the first instance to subject their properties to a use they neither planned nor desired.” Id. at 105 (emphasis added). Finally, the Court held that the “buy-out and replacement” provisions did not save the law from constitutional challenge. Rejecting the City’s argument that it, did, the Court observed that,
[i]n effect, the City, in the buy-out and replacement exemptions, is saying no more to the owners than that it will not do something unconstitutional if they pay the City not to do it. But if the initial act amounts to an unlawful taking, then permitting the owners to avoid the illegal confiscation by paying a “ransom” cannot make it lawful.
Id. at 113.
Two later cases, Sobel v. Higgins, 590 N.Y.S.2d 883 (App. Div. 1992), and Dawson v. Higgins, 588 N.Y.S.2d 93 (Sup. Ct. 1992), involved attempts by landlords to evict tenants whose occupancy pre-dated the landlord’s purchase of their buildings. The Court distinguished both Loretto and Sobel on that basis. As the Court noted in Dawson,
[i]n this case the tenant protections are predicated on the pre-existing nexus between the owners and the tenants and do not involve, as did the Seawall case, the obligation to rent-up vacancies.
These long-term tenants were not quartered upon the plaintiffs ... The tenants were in possession for more than a decade before the plaintiffs came on the scene; and the plaintiffs knowingly bought into the highly regulated business of being a landowner.
Dawson, supra, 588 N.Y.S.2d at 96. Similarly, the Court in Sobel rejected application of the “takings” principle articulated in Seawall because the tenants were already occupying their units when the landlord purchased the building:
A physical taking is found only where there is a permanent physical occupation of the owner’s property by the government, a stranger or a third party, hardly the situation here given that plaintiffs tenants were already residing on the premises when purchased by plaintiff.
Sobel, supra, 590 N.Y.S.2d at 885.
Applying principles distilled from the foregoing cases, I am of the opinion that, on the facts of this case, there is no taking although the Board’s order comes as close to the line as it is possible to get without crossing over that line. First of all, there is no present physical occupation. Plaintiff is free to exclude anyone and everyone from the property and will have the power to do so as long as he lives there. Second, any economic burden with which the property is impressed as a consequence of the reversionary condition[7] flows from plaintiffs conscious decision to get into the housing market and is not the consequence of a governmental order wholly divorced from plaintiffs own action. Third, and finally, plaintiff entered the housing market at a time when the current regulatory scheme was in existence. He thus knew, or was deemed to have known, that voluntary entry might make an exit difficult. He nonetheless entered and now is simply burdened by some potential impact on the economic value of his property.
ORDER
In light of the foregoing, judgment will enter
1. Declaring that the Order entered by the Cambridge Rent Control Board on November 10, 1992 in Case No. RPZ 92-005 does not violate rights possessed by plaintiff under the Constitution of the United States or the Commonwealth of Massachusetts and does not otherwise violate applicable statues or regulations.
2. Dismissing plaintiffs Complaint for review.

 The parties have spent a great deal of time arguing about the proper interpretation of the Board’s order. Plaintiff contends that the second paragraph of the order requires him to *503 accept boarders now. The Board contends that the order does not require acceptance of any boarders as long as plaintiff himself lives on the property. After he stops living there, however, boarders must be accepted for two of the four available units. The entire order must be read as a whole and one part will not be interpreted to cancel another unless no other construction is possible. E.g. Quincy City Hospital v. Rate Setting Commission, 406 Mass. 431, 443 (1990). A sensible reading of the order as a whole avoids all possible internal inconsistencies. Plaintiffs reading, on the other hand, nullifies the entire purpose and effect of ¶1. Moreover, the Board’s construction, articulated both at oral argument and in the Board’s brief, constitutes a judicial admission which binds the Board concerning the proper interpretation of its order. See Brocklesby v. City of Newton, 294 Mass. 41, 43 (1936). In sum, both a sensible reading of the order itself and the Board’s construction of that order lead to the inescapable conclusion that the occupants of the property are not required to take on a single boarder until plaintiff stops living in the building. The order says nothing about plaintiffs wife or daughter but he sought no modification to include them in the exemption.

 modification said nothing about occupancy of the house by plaintiffs wife and daughter. Plaintiff, however, sought no further modifications to include them within the order’s sweep.

 0 boarders are there now and plaintiff is not required to accept boarders as long as he lives there. For regulatoiy purposes however, that does not change the essential character of the building, an essential character created by plaintiffs voluntary act of admitting boarders.

 To be sure, the Yee caveat is dictum but dictum that illuminates what was and was not decided in Yee and earlier cases.

 force of Justice Rhenquisf s opinion, of course, does not flow simply from the opinion itself. As the voice of one dissenter to a decision that itself has no precedential value, the opinion simply commands whatever following its persuasive power gathers. The real force of the opinion comes from its acceptance by the seven justices who joined the majority opinion in Yee, albeit acceptance as dictum and preceded by a “see also” signal.

 In one federal case dealing with a relevant portion of the Ordinance, the United States Court of Appeals for the First Circuit held that requiring a removal permit before converting apartment units to condominiums did not amount to an unconstitutional taking. The Court observed that the holding in Loretto was very narrow and that no “physical occupation” was present. In a footnote the court expanded:
To be sure, we do not suggest that all regulation of rental housing is outside the sweep of Loretto. Indeed, the Loretto Court itself hypothesized that the physical occupation rule might apply were “the government to requisition a certain number of apartments as permanent government offices,” Loretto, 458 U.S. at 439 n.17, 102 S.Ct. at 3178 n.17. It seems patent to us, however, that an action which actually changes control over, as well as occupation and use of, the property, arguably within Loretto, is something very different from a regulation that restricts the conversion of rental apartments into condominiums or cooperatives, but which allows their owners to seek variances and, if variances are denied, to continue either to rent the units and receive a fair net operating income therefrom or to occupy the units.
Gilbert v. City of Cambridge, 932 F.2d 51, 60 n.10 (1st Cir. 1991), cert. denied, 112 S.Ct. 922 (1991).

 The record is silent as to the likely impact of the reversion on the property’s market value.