*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

THE GYM 24/7 FITNESS, LLC, and All Others Similarly Situated,

Plaintiffs-Appellees/Cross-Appellants,

v

STATE OF MICHIGAN,

Defendant-Appellant/Cross-Appellee.

FOR PUBLICATION
March 31, 2022
9:05 a.m.

No. 355148
Court of Claims
LC No. 20-000132-MM

Before: CAVANAGH, P.J., and MARKEY and SERVITTO, JJ.

MARKEY, J.

Defendant, the State of Michigan (the State), appeals by leave granted the opinion and order of the Court of Claims that denied the State's motion for summary disposition with respect to an action brought by plaintiff, The Gym 24/7 Fitness, LLC (the Gym),[1] alleging an unconstitutional taking of its business property by operation of Executive Orders issued by the Governor that temporarily shuttered the business in response to the COVID-19 pandemic. The Gym demanded "just compensation" for the taking of its private property that resulted from the closure. The Gym cross appeals, arguing that the Court of Claims properly denied the State's motion for summary disposition but applied the wrong analytical framework.[2] This appeal concerns the interplay between the constitutional principles applicable to the taking of private

---

[1] The Gym filed suit in an individual capacity and as a representative of a putative class of plaintiffs comprised of gyms, fitness centers, recreation centers, sports facilities, exercise facilities, exercise studios, and other similarly-situated businesses in Oscoda, Alcona, Ogemaw, Iosco, Gladwin, Arenac, Midland, Bay, Saginaw, Tuscola, Sanilac, Huron, Gratiot, Clinton, Shiawassee, Eaton, and Ingham Counties. At this stage of the proceedings, the class had not been certified by the Court of Claims. Therefore, for purposes of this opinion, we shall simply refer to the Gym as the party pursuing the litigation.

[2] We note that a cross-appeal is unnecessary when simply urging an alternative basis for affirmance. *Middlebrooks v Wayne Co*, 446 Mich 151, 166 n 41; 521 NW2d 774 (1994).

-1-

property for public use and the principles applicable to the state's authority to exercise its police powers to protect the health, safety, and welfare of its citizens. We reverse and remand for entry of judgment in favor of the State.

## I. BACKGROUND

### A. RULING BY THE MICHIGAN SUPREME COURT – COVID-19 LITIGATION

The Gym filed suit about three months before our Supreme Court issued its opinion in *In re Certified Questions from the United States Dist Court, Western Dist of Mich, Southern Div*, 506 Mich 332; 958 NW2d 1 (2020). The decision provided background information that is helpful in understanding and giving context to the instant litigation. The Michigan Supreme Court observed and ruled:

> This case concerns the nature and scope of our state's public response to one of the most threatening public-health crises of modern times. In response to a global, national, and state outbreak of the severe acute respiratory disease named COVID-19, Michigan's Governor has issued a succession of executive orders over the past six months limiting public and private gatherings, *closing and imposing restrictions upon certain businesses*, and regulating a broad variety of other aspects of the day-to-day lives of our state's citizens in an effort to contain the spread of this contagious and sometimes deadly disease.

> The ongoing validity of these executive orders has been the subject of much public debate as well as litigation in both state and federal courts. In the interest of comity, the United States District Court for the Western District of Michigan has asked this Court to resolve critical questions concerning the constitutional and legal authority of the Governor to issue such orders. We hereby respond to the federal court in the affirmative by choosing to answer the questions the federal court has certified, concluding as follows: first, the Governor did not possess the authority under the Emergency Management Act of 1976 (the EMA), MCL 30.401 *et seq.*, to declare a "state of emergency" or "state of disaster" based on the COVID-19 pandemic after April 30, 2020; and second, the Governor does not possess the authority to exercise emergency powers under the Emergency Powers of the Governor Act of 1945 (the EPGA), MCL 10.31 *et seq.*, because that act is an unlawful delegation of legislative power to the executive branch in violation of the Michigan Constitution. Accordingly, the executive orders issued by the Governor in response to the COVID-19 pandemic now lack any basis under Michigan law.

> * * *

> The coronavirus . . . is a respiratory disease that can result, and has resulted, in significant numbers of persons suffering serious illness or death. In response to COVID-19, on March 10, 2020, one day before it was declared a pandemic by the World Health Organization, the Governor issued Executive Order (EO) No. 2020-04, declaring a "state of emergency" under the EPGA and the EMA. On March 20, 2020, the Governor issued EO 2020-17, which prohibited medical providers from

performing nonessential procedures. On March 23, 2020, she issued EO 2020-21, which ordered all residents to stay at home with limited exceptions.

On April 1, 2020, she issued EO 2020-33, which declared a "state of emergency" under the EPGA and a "state of emergency" and "state of disaster" under the EMA. She then requested that the Legislature extend the state of emergency and state of disaster by 70 days, and a resolution was adopted, extending the state of emergency and state of disaster, but only through April 30, 2020. Senate Concurrent Resolution No. 2020-24.

On April 30, 2020, the Governor issued EO 2020-66, which terminated the declaration of a state of emergency and state of disaster under the EMA. But, immediately thereafter, she issued EO 2020-67, which provided that a state of emergency remained declared under the EPGA. [*In re Certified Questions from the United States Dist Court*, 506 Mich at 337-339 (emphasis added).]

## B. THE COMPLAINT

The Gym's complaint set forth various allegations that touched on many of the events and circumstances discussed by the Supreme Court in *In re Certified Questions from the United States Dist Court*. The Gym alleged that throughout the period during which the Governor issued the EOs, the one constant was the closure of fitness centers for the public purpose of halting or minimizing the spread of COVID-19.[3] The Gym further contended that the Governor had placed the cost of the EOs "squarely upon the shoulders of private businesses and ha[d] failed to justly compensate affected parties for these takings undertaken for the benefit to the general public." The Gym maintained that many fitness centers were on the verge of economic collapse as a direct result of the Governor's actions. The Gym also indicated in its complaint that the lawsuit did not seek to contest whether the Governor's EOs were prudent or whether they were within her authority to issue. Indeed, the Gym asserted that it accepted that the Governor had taken her actions regarding fitness centers "solely for a public purpose." And, according to the Gym, when the government takes property for a public purpose the state and federal constitutions "require the payment of just compensation if eminent domain proceedings are not first commenced."

The Gym further alleged that notwithstanding the legitimate governmental purpose in issuing the EOs, they "halted all economic activity for . . . [fitness centers] and made it impracticable to benefit from the property interests belonging to the [fitness centers] for any

---

[3] The Gym did not specifically identify any particular EO in its complaint. We note that in March 2020, the Governor issued EO 2020-9, which temporarily closed, among other places of public accommodation, "[g]ymnasiums, fitness centers, recreation centers, indoor sports facilities, indoor exercise facilities, exercise studios, and spas[.]" EO 2020-9(1)(f). Multiple EOs on the subject were subsequently issued. Eventually, pursuant to EO 2020-176(3)(b), the Gym and other fitness centers were permitted to reopen their doors on September 9, 2020. Thus, the closure lasted approximately six months.

economically beneficial purpose, and inflicted very nearly the same effect for constitutional purposes as appropriating or destroying the property as a whole." The Gym claimed that despite issuing the EOs "for a readily-apparent public purpose," the Governor failed to compensate fitness centers, causing them to suffer "substantial—and perhaps total—diminution of value in their property interests as a result." The Gym contended that fitness centers should not have been forced to bear the public burden that in all fairness should have been borne by the public as a whole through the government's payment of just compensation.

In Count I of the complaint, the Gym alleged a cause of action for inverse condemnation. In Count II, the Gym asserted a takings claim under Const 1963, art 10, § 2. And in Count III, the Gym alleged a takings claim under US Const, Am V. With respect to each of the three counts, the Gym maintained that the State had taken "constitutionally-protected property interests" from fitness centers "in the form of the on-going operations of their business[es] . . . and the resulting revenues and profits therefrom, and have appropriated or 'took' said property interests for public use without the payment of just compensation and have failed to commence appropriate condemnation proceedings." The Gym demanded the payment of "just compensation" as damages.

## C. THE STATE'S MOTION FOR SUMMARY DISPOSITION

In lieu of filing an answer to the Gym's complaint, the State moved for summary disposition under MCR 2.116(C)(7), (8), and (10). The State first argued that under precedent issued by the United States Supreme Court, the government has broad authority to implement emergency measures to address an epidemic that threatens society. The State contended that the exercise of police powers to protect the public health and safety does not give rise to inverse condemnation and taking claims. Therefore, the government "need not pay compensation to businesses subjected to reasonable, temporary public health and safety measures imposed during a pandemic." The State additionally maintained that the Gym failed to sufficiently plead a claim for inverse condemnation, as there was no assertion of actions that permanently harmed the value of the Gym's property, no allegation of facts suggesting that the State had abused its power, and no contention that the Gym had suffered a unique or special injury. Further, the State argued that the taking claims were facially meritless "because the challenged regulation is directed toward public health and safety, removing it from the ambit of relevant takings precedent." The State also noted that the Gym had not properly pleaded a viable takings claim. The State explained that the Gym had not alleged a taking at all, considering that the EOs constituted health-and-safety regulations. Finally, the State argued that there had been no regulatory taking because such a taking requires more than a decidedly-proper use of a government's police powers.

In a response to the State's motion for summary disposition, the Gym provided the following overview of its position:

> This case is unlike any other case that has come before. This suit does not seek to contest whether Governor Whitmer's decision to issue the Executive Orders that have perpetually closed gymnasiums [and] fitness centers . . . since March 10, 2020[,] were prudent or were . . . within her authority to issue. Moreover, this suit accepts as fact that Governor Whitmer took the action she did . . . solely for a public purpose. When the government takes property for a public purpose, the US and

Michigan Constitutions require the payment of just compensation if eminent domain proceedings are not first commenced. . . . The Gym . . . alleges (and it is not disputed) that the State . . . failed to commence appropriate condemnation proceedings and failed to pay just compensation. The question is whether that failure is in violation of the US and Michigan's constitutional obligations to do or pay the same. Valid taking[] claim[s] have been pled and there remains substantial material questions that need to be resolved by this case. Summary disposition at this stage must be denied. [Quotation marks, record citations, and brackets omitted.]

## D. COURT OF CLAIM'S RULING ON MOTION FOR SUMMARY DISPOSITION

In September 2020, the Court of Claims issued a written opinion and order denying the State's motion for summary disposition. The Court of Claims initially noted that this case did not involve a classic taking in which there was a direct appropriation or physical invasion of private property.[4] Instead, the case concerned "regulations effectuated by various Executive Orders and whether those regulations amount[ed] to a 'regulatory taking.' " The Court of Claims explained that there are two types of regulatory takings—a categorical taking and a partial taking—the latter of which is evaluated under the test described in *Penn Central Transp Co v New York City*, 438 US 104; 98 S Ct 2646; 57 L Ed 2d 631 (1978). It then discussed the theory of inverse condemnation.

The Court of Claims next pointed out that the case entailed the exercise of police power to curb a public health emergency and that the constitutional rights regarding takings and inverse condemnation, like all constitutional rights, can be reasonably restricted in order to combat a public health emergency. The Court of Claims recognized that states have broad authority to fight the spread of dangerous communicable diseases and that the police power retained by the states to protect the lives, health, and general welfare of the people empowers them to confront pandemics largely absent court interference. But the Court of Claims also emphasized that a "state's ability to act pursuant to the police power, even during a pandemic, is not absolute." The Court of Claims, citing *Jacobson v Massachusetts*, 197 US 11; 25 S Ct 358; 49 L Ed 643 (1905), observed that court interference in the face of the exercise of police power is appropriate when a closure of a facility

---

[4] The Court of Claims indicated that fitness centers and gyms were allowed to reopen pursuant to a new EO issued after briefs on the motion for summary disposition had been submitted. But the Court of Claims found that the issues presented in the case were not moot. No party is claiming mootness on appeal. And given that a temporary taking can be compensable, the issues raised in this case are plainly not moot. See *First English Evangelical Lutheran Church of Glendale v Los Angeles Co*, 482 US 304, 321; 107 S Ct 2378; 96 L Ed 2d 250 (1987) ("[W]here the government's activities have already worked a taking . . ., no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective."); see also *Cummins v Robinson Twp*, 283 Mich App 677, 704; 770 NW2d 421 (2009) (the temporary taking of private property for public use absent just compensation comes within the protection of the Fifth Amendment).

-5-

is arbitrary and oppressive, when the closure has no substantial relation to the public health, or when the closure is a plain and palpable invasion of rights.

With this backdrop, the Court of Claims ruled:

> On the briefing and documentary evidence presented in the parties' briefing, the Court concludes that summary disposition is not warranted at this time. In that regard, [the State] appears to take the position that any measure taken under the name of public health is permissible and that the Court must conclude that the restrictions at issue were reasonable and not arbitrary because [the State] has declared them as such. Indeed, [the State's] briefing makes many factual assertions without any documentary evidence to support those assertions. Caselaw, while giving leeway to the state's public health measures, does not give that much leeway . . . . [The State] has produced no evidence in support of its initial decision to close fitness facilities, nor has it provided evidence that informed its decision to continue to prohibit use of the facilities, even in a reduced or limited capacity. Nor has [the State] produced evidence suggesting why other indoor activities were permitted to resume—such as casinos in August 2020—but gyms and fitness centers remained closed at that time. And while [the State] cursorily cites after-the-fact internet materials as justifications for its decisions, there is no documentary evidence suggesting whether the [S]tate relied on these materials, or any other evidence, in its decision-making.[5] [The State's] citation to these materials, with no indicia of whether this information ever informed the pertinent decisions in this case, does not satisfy [the State's] burden as the moving party on a motion for summary disposition under MCR 2.116(C)(10). Even with the deferential manner of review that applies, the documentary evidence is not sufficient for the Court to make an informed decision on the pertinent inquiry demanded by *Jacobson* and its progeny. As a result, summary disposition will not issue at this time. [Citation and footnotes omitted.]

The Court of Claims denied the motion for summary disposition without prejudice. The State filed an application for leave to appeal in this Court, and the Court of Claims entered a stay while the application was pending. This Court subsequently granted leave to appeal. *The Gym 24/7 Fitness LLC v Michigan*, unpublished order of the Court of Appeals, entered March 16, 2021 (Docket No. 355148). The Gym then filed a cross-appeal.

## II. ANALYSIS

### A. OVERVIEW OF ARGUMENTS ON APPEAL

The State argues that the Gym's complaint failed as a matter of law to plead a valid takings claim. The State contends that when the government properly exercises its police power, which the Gym had conceded, the Taking Clauses of our state and federal constitutions are simply not

---

[5] We note that the Court of Claims's discussion regarding the documentary evidence was consistent with the record.

implicated. The State also maintains that, regardless, there was no categorical taking because the Governor's actions were only temporary and partial in nature. The State further asserts that there was no non-categorical taking of private property upon analysis of economic impact, consideration of interference with investment-backed expectations, and contemplation of the character of the government's actions. The State additionally argues that the Gym's inverse condemnation claim failed as a matter of law because it requires a showing of abusive governmental action, which the Gym admitted did not occur, and the infliction of a unique injury, which the Gym did not allege.

As it maintained below, the Gym continues to argue that for purposes of this lawsuit, it does not contest whether the closure of fitness centers was prudent or within the Governor's authority, and it accepts that the Governor closed the private fitness centers solely for a public purpose.[6] The Gym contends that under those circumstances—when the government takes private property for a public purpose—the United States and Michigan Constitutions mandate the payment of "just compensation." The State, however, did not commence any form of condemnation proceeding and had not paid just compensation to the Gym or any fitness center. With respect to the ruling by the Court of Claims, the Gym asserts that the Court reached the right result but for the wrong reason, in that it applied an incorrect legal standard. The Gym argues that "[u]nder takings jurisprudence, whether the taking by the government was reasonable or unreasonable is legally irrelevant." The Gym explains that "[g]overnments can, almost always, take private property; [but] they commit an actionable wrong when they fail to pay just compensation." Therefore, according to the Gym, this Court should affirm the ruling by the Court of Claims, albeit on different grounds.

In reply, the State argues that the government's exercise of police power to place temporary limits on the use of property in order to halt the spread of a deadly pandemic does not constitute a taking as a matter of law. And the State contends that the caselaw that the Gym relies on to argue the contrary is easily distinguishable and provides no support for the Gym's stance.

## B. STANDARD OF REVIEW AND PRINCIPLES OF SUMMARY DISPOSITION

We review de novo a trial court's decision on a motion for summary disposition. *Hoffner v Lanctoe*, 492 Mich 450, 459; 821 NW2d 88 (2012). This Court also reviews de novo issues of constitutional law. *Adair v Michigan*, 497 Mich 89, 99; 860 NW2d 93 (2014). And the question whether an unconstitutional taking occurred is likewise reviewed de novo on appeal. *Cove Creek Condo Ass'n v Vistal Land & Home Dev, LLC*, 330 Mich App 679, 696; 950 NW2d 502 (2019).

The Court of Claims ultimately analyzed the motion for summary disposition under MCR 2.116(C)(10), examining the documentary evidence, or lack thereof, in making its ruling. In

---

[6] Even with the decision by our Supreme Court in *In re Certified Questions from the United States Dist Court,* 506 Mich 332, that the EPGA is unconstitutional and that the EMA did not give the Governor authority to issue EOs regarding the pandemic after April 30, 2020, the Gym has made no attempt to alter its position and theory of the case. We do note that EO 2020-9 was the first EO closing fitness centers and that it was issued in March 2020, meaning that the Governor did have the authority to issue EO 2020-9 at the time under the EMA.

*Batista v Office of Retirement Servs*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 353832); slip op at 9, this Court recited the principles governing review of a motion brought under MCR 2.116(C)(10):

> MCR 2.116(C)(10) provides that summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A motion brought pursuant to MCR 2.116(C)(10) tests the factual support for a party's action. "Affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted in the motion are required . . . when judgment is sought based on subrule (C)(10)," MCR 2.116(G)(3)(b), and such evidence, along with the pleadings, must be considered by the court when ruling on the (C)(10) motion, MCR 2.116(G)(5). "When a motion under subrule (C)(10) is made and supported . . ., an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." MCR 2.116(G)(4). A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party. A court may only consider substantively admissible evidence actually proffered by the parties when ruling on the motion. [Quotation marks and citations omitted; ellipses in original.]

The issues raised on appeal also implicate MCR 2.116(C)(8), which provides for summary disposition when a "party has failed to state a claim on which relief can be granted." MCR 2.116(C)(8) tests the legal sufficiency of a complaint. *Beaudrie v Henderson*, 465 Mich 124, 129; 631 NW2d 308 (2001). In rendering its decision under MCR 2.116(C)(8), a trial court may only consider the pleadings. *Id*. The trial court must accept as true all of the factual allegations in the complaint. *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 380-381; 563 NW2d 23 (1997). "The motion should be granted if no factual development could possibly justify recovery." *Beaudrie*, 465 Mich at 130.

## C.  CONSTITUTIONAL CONSTRUCTION PRINCIPLES

In *AFSCME Council 25 v State Employees' Retirement Sys*, 294 Mich App 1, 8-9; 818 NW2d 337 (2011), this Court articulated the governing principles of construction with respect to the Michigan Constitution:

> When interpreting a constitutional provision, the primary goal is to determine the initial meaning of the provision to the ratifiers, the people, at the time

of ratification. The primary objective of constitutional interpretation, not dissimilar to any other exercise in judicial interpretation, is to faithfully give meaning to the intent of those who enacted the law. To effectuate this intent, the appellate courts apply the plain meaning of the terms used in the constitution. When technical terms are employed, the meaning understood by those sophisticated in the law at the time of enactment will be given unless it is clear that some other meaning was intended. To clarify the meaning of the constitutional provision, the court may examine the circumstances surrounding the adoption of the provision and the purpose sought to be achieved. An interpretation resulting in a holding that the provision is constitutionally valid is preferred to one that finds the provision constitutionally invalid, and a construction that renders a clause inoperative should be rejected. Constitutional convention debates are relevant, albeit not controlling. Every provision in our constitution must be interpreted in light of the document as a whole, and no provision should be construed to nullify or impair another. [Quotation marks, citations, and brackets omitted.]

When construing the Michigan Constitution, we are not bound by the United States Supreme Court's interpretation of the United States Constitution, even when the constitutional language in both documents is identical. *Harvey v Michigan*, 469 Mich 1, 6 n 3; 664 NW2d 767 (2003). When, however, we are engaged in the construction of the United States Constitution, we are bound by decisions of the United States Supreme Court interpreting the United States Constitution. *People v Lechner*, 307 Mich 358, 361; 11 NW2d 918 (1943); *Easley v John Hancock Mut Life Ins Co*, 70 Mich App 451, 455; 245 NW2d 785 (1976), rev'd on other grounds 403 Mich 521 (1978).

## D.  DISCUSSION

In light of the theory pursued by the Gym, the primary question presented in this appeal is whether the business owner of private property is entitled to just compensation under either the state or federal Takings Clause when the government properly exercises its police power to protect the health, safety, and welfare of its citizens during a pandemic by temporarily closing the owner's business operations.

We first note that the Gym is correct in its assessment that the Court of Claims did not properly analyze the motion for summary disposition, misconstruing the nature of the Gym's argument. The Court of Claims determined that the closure of fitness centers had to be reasonable and not arbitrary and oppressive and that the State failed to provide any documentary evidence to establish reasonableness and the absence of arbitrariness and oppressiveness. The Gym, however, from the commencement of this case through the motion for summary disposition, conceded that the closure of fitness centers reflected the proper exercise of police power. In other words, the Gym *effectively* took the position that the Governor's EOs were reasonable and not arbitrary and

oppressive.[7]  Accordingly, the Court of Claims erred in its reasoning for denying the State's motion for summary disposition.

### 1.  POLICE POWER OF THE STATE

We now examine the police power of the states.  In *Jacobson*, 197 US at 12, the United States Supreme Court addressed and upheld the constitutionality of a Massachusetts statute giving local boards of health—when necessary for the public health or safety—the authority to require and enforce the vaccination and revaccination of inhabitants.  The case arose when the board of health for the city of Cambridge mandated smallpox vaccinations.  *Id.* at 13-14.  The Court observed:

> The authority of the state to enact this statute is . . . referred to what is commonly called the police power[]—a power which the state did not surrender when becoming a member of the Union under the Constitution. Although this court has refrained from any attempt to define the limits of that power, . . . it has distinctly recognized the authority of a state to enact quarantine laws and health laws of every description; indeed, all laws that relate to matters completely within its territory and which do not by their necessary operation affect the people of other states. According to settled principles, the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety. [*Id.* at 24-25 (quotation marks and citations omitted).]

The *Jacobson* Court indicated that "[t]he possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community." *Id.* at 26 (quotation marks and citation omitted).  The United States Supreme Court "has more than once recognized it as a fundamental principle that persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state[.]" *Id.* (quotation marks

---

[7] To be clear, the Gym does not believe that the closure of fitness centers was reasonable.  But the Gym's theory of the case is that it is entitled to just compensation regardless of the reasonableness of the EOs.  In its brief on appeal, the Gym notes that it provided documentary evidence in the form of a study that demonstrated that shuttering gyms and fitness centers was unnecessary and that the risk of transmitting COVID-19 at such facilities was no greater than at other businesses involved in indoor activities.  The Gym contends that the State's argument to the contrary was not supported by any proper documentary evidence and that even if the hearsay references cobbled together by the State and obtained from the Internet can be considered, it minimally created a genuine issue of material fact on the matter.  Nevertheless, the Gym indicates that this underlying factual dispute "misses the pertinent point" and is irrelevant.  And the Gym emphasizes that "[t]his suit does not seek to contest whether Governor Whitmer's decision to issue the [EOs] . . . were [sic] prudent."

and citations omitted).  The Supreme Court cautioned that "[e]ven liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will."  *Id.* at 26-27.

In *People ex rel Hill v Lansing Bd of Ed,* 224 Mich 388, 390; 195 NW 95 (1923), the Michigan Supreme Court addressed a comparable smallpox-vaccination mandate, ruling as follows:

> We are plowing no virgin field in considering the questions here involved. Numerous decisions, both federal and state, have considered the questions now before us. They are not all in accord and in some instances are not reconcilable. There is, however, a very marked trend in them in one direction, that which upholds the right of the state, in the exercise of its police power and in the interest of the public health, to enact such laws, such rules and regulations, and will prevent the spread of this dread disease. The power of the state to require vaccination in case the disease was present in a community was upheld in *Jacobson* . . . .

"The Constitution guarantees to citizens the general right to engage in any business which does not harm the public[,]" but "[t]his constitutional right to engage in business is subject to the sovereign police power of the State to preserve public health, safety, morals and public welfare." *Grocers Dairy Co v G S McIntyre*, 377 Mich 71, 76; 138 NW2d 767 (1966).  In general, "[i]t has been long recognized that the state, pursuant to its inherent police power, may enact regulations to promote the public health, safety, and welfare." *Blue Cross & Blue Shield of Mich v Milliken*, 422 Mich 1, 73; 367 NW2d 1 (1985).  "The test to determine whether legislation enacted pursuant to the police power comports with due process is whether the legislation bears a reasonable relation to a permissible legislative objective." *Id.* at 74 (quotation marks and citations omitted).  In this case, the Gym's theory of liability does not hinge on any alleged due process violation or other claimed frailty with the Governor's exercise of police power in issuing the EOs; rather, the Gym accepts for the sake of argument that the Governor properly acted for a public purpose, but nevertheless demands "just compensation" for a taking of private property.[8]

### 2.  THE TAKING CLAUSES AND INVERSE CONDEMNATION

---

[8] We note that "the police power is *legislative* in nature." *In re Certified Questions from the United States Dist Court*, 506 Mich at 364 (emphasis added).  And we are addressing EOs that were issued by the Governor.  The Governor, however, relied on legislative enactments—the EMA and the EPGA—as the source of her authority to issue the EOs; therefore, police powers are indeed implicated.  Our Supreme Court stated:

> Concerning the subject matter of the emergency powers conferred by the EPGA, it is remarkably broad, authorizing the Governor to enter orders "to protect life and property or to bring the emergency situation within the affected area under control." MCL 10.31(1). It is indisputable that such orders "to protect life and property" encompass a substantial part of the entire police power of the state.  [*In re Certified Questions from the United States Dist Court*, 506 Mich at 363 (citation omitted).]

We now examine takings jurisprudence.  Under the United States Constitution, private property shall not be taken "for public use, without just compensation."  US Const, Am V.  "The Takings Clause of the Fifth Amendment [is] applicable to the States through the Fourteenth Amendment[.]"  *Cedar Point Nursery v Hassid*, ___ US ___; 141 S Ct 2063, 2071; 210 L Ed 2d 369 (2021).  And under the Michigan Constitution, "[p]rivate property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law."  Const 1963, art 10, § 2.  "While we draw on authority discussing and interpreting both clauses, we must keep in mind that Michigan's Takings Clause has been interpreted to afford property owners greater protection than its federal counterpart when it comes to the state's ability to take private property for a public use under the power of eminent domain."  *Rafaeli, LLC v Oakland Co*, 505 Mich 429, 449-450; 952 NW2d 434 (2020).

With respect to the analysis regarding an alleged taking under the Fifth Amendment, the United States Supreme Court in *Cedar Point Nursery*, 141 S Ct at 2071-2072, recently set forth the following analytical framework:

> When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation. The Court's physical takings jurisprudence is as old as the Republic. The government commits a physical taking when it uses its power of eminent domain to formally condemn property. The same is true when the government physically takes possession of property without acquiring title to it. And the government likewise effects a physical taking when it occupies property— say, by recurring flooding as a result of building a dam. These sorts of physical appropriations constitute the clearest sort of taking, and we assess them using a simple, per se rule: The government must pay for what it takes.

> When the government, rather than appropriating private property for itself or a third party, instead imposes regulations that restrict an owner's ability to use his own property, a different standard applies. Our jurisprudence governing such use restrictions has developed more recently. Before the 20th century, the Takings Clause was understood to be limited to physical appropriations of property. In *Pennsylvania Coal Co v Mahon*, 260 US 393; 43 S Ct 158; 67 L Ed 322 (1922), however, the Court established the proposition that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. This framework now applies to use restrictions as varied as zoning ordinances, orders barring the mining of gold, and regulations prohibiting the sale of eagle feathers. To determine whether a use restriction effects a taking, this Court has generally applied the flexible test developed in *Penn Central*, balancing factors such as the economic impact of the regulation, its interference with reasonable investment-

backed expectations, and the character of the government action. [Quotation marks and citations omitted.[9]]

The Taking Clauses of the Michigan and United States Constitutions both "prohibit the taking of private property for public use without just compensation." *Chelsea Investment Group LLC v City of Chelsea*, 288 Mich App 239, 261; 792 NW2d 781 (2010). "The Taking Clauses do not prohibit the government's interference with a private individual's property, but require that interferences amounting to a taking be compensated." *Id.* Generally speaking, the government takes private property from the owner by way of formal condemnation proceedings, but regulations issued by the government that overburden property can also result in a compensable taking. *Id.* A "categorical" taking arises "when there has been a physical invasion of a landowner's property *or* when a regulatory taking has deprived an owner of *all* economically and beneficial use of the land." *Id.* at 261 n 5 (emphasis added). "Regulatory taking claims that do not rise to the level of a categorical taking are governed by the standard set out in *Penn Central . . . .*" *Id.* at 261.[10] "[A] mere reduction in the value of regulated property is insufficient by itself to establish that a compensable taking has occurred." *Id.* at 262.

The Michigan Supreme Court in *K & K Constr, Inc v Dep't of Natural Resources*, 456 Mich 570, 576; 575 NW2d 531 (1998), similarly observed that a person's property may effectively be taken when it is overburdened by regulations. Taking actions require a case-specific inquiry, and land-use regulations can effectuate a taking when they deny a landowner economically viable use of his or her property. *Id.* As indicated, a "categorical" taking occurs when a regulation

---

[9] In *Yee v City of Escondido, Cal*, 503 US 519, 522-523; 112 S Ct 1522; 118 L Ed 2d 153 (1992), the United States Supreme Court similarly stated:

> Most of our cases interpreting the [Takings] Clause fall within two distinct classes. Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation. But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole. The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions. [Citations omitted.]

[10] "When a taking is noncategorical, the court will undertake the fact-based inquiry enumerated in *Penn Central* to evaluate whether the governmental action constituted a compensable taking of the property interest." *American Pelagic Fishing Co, LP v United States*, 379 F3d 1363, 1372 (CA Fed, 2004).

deprives an owner of *all* economically productive or beneficial use of property. *Id.* at 576-577.[11] And a noncategorical regulatory taking can occur upon application of the *Penn Central* balancing test. *Id.* at 577.

Inverse condemnation is a de facto taking in which the government effectively takes property absent formal condemnation proceedings. *Merkur Steel Supply, Inc v Detroit*, 261 Mich App 116, 125; 680 NW2d 485 (2004). "An inverse condemnation claim may be based upon the government's 'regulatory taking' of private property." *Dorman v Clinton Twp*, 269 Mich App 638, 646; 714 NW2d 350 (2006). Inverse condemnation concerns the taking of private property, and pursuant to the Taking Clauses, "a victim of such a taking is entitled to just compensation for the value of the property taken." *Hart v Detroit*, 416 Mich 488, 494; 331 NW2d 438 (1982).[12]

Finally, as noted earlier in this opinion, a temporary taking can be compensable under the Taking Clauses. *First English Evangelical Lutheran Church of Glendale v Los Angeles Co*, 482 US 304, 321; 107 S Ct 2378; 96 L Ed 2d 250 (1987); *Cummins v Robinson Twp*, 283 Mich App 677, 704; 770 NW2d 421 (2009). To summarize, there are physical takings and regulatory takings. A physical taking of private property is a categorial taking that requires the payment of just compensation. A regulatory taking involving the deprivation of *all* economically productive or

---

[11] The United States Supreme Court in *Lucas v South Carolina Coastal Council*, 505 US 1003, 1019; 112 S Ct 2886; 120 L Ed 2d 798 (1992), stated "that there are good reasons for our frequently expressed belief that when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking."

[12] In *Hinojosa v Dep't of Natural Resources*, 263 Mich App 537, 548; 688 NW2d 550 (2004), this Court discussed inverse condemnation:

> What governmental action constitutes a "taking" is not narrowly construed, nor does it require an actual physical invasion of the property. No precise formula exists. Pertinent factors include whether the governmental entity abused its exercise of legitimate eminent domain power to plaintiff's detriment. Further, a plaintiff alleging inverse condemnation must prove a causal connection between the government's action and the alleged damages. A plaintiff alleging a de facto taking or inverse condemnation must prove that the government's actions were a substantial cause of the decline of his property's value and also establish the government abused its legitimate powers in affirmative actions directly aimed at the plaintiff's property. While there is no exact formula to establish a de facto taking, there must be some action by the government specifically directed toward the plaintiff's property that has the effect of limiting the use of the property. [Citations, ellipsis, and quotation marks omitted.]

Inaction or omissions cannot support a claim of inverse condemnation. *Id*. at 549.

beneficial use of property is also a categorical taking, requiring the payment of just compensation. The second type of regulatory taking—a noncategorical taking—is one that is determined upon application of the *Penn Central* balancing test. Additionally, inverse condemnation arises when the government takes property, either by physical invasion or regulation, absent formal condemnation proceedings. Finally, a taking can be either temporary or permanent.

## 3. RESOLUTION

We begin by noting that to the best of our knowledge, every federal court and state appellate court that has addressed a takings claim stemming from the government's closure of a business as a safeguard against the spread of COVID-19 has rejected the claim. See *Bojicic v DeWine*, ___ F Supp 3d ___, ___ (ND Ohio, 2021); slip op at 12-13; *Case v Ivey*, 542 F Supp 3d 1245, 1281-1283 (MD Ala, 2021); *Underwood v City of Starkville*, 538 F Supp 3d 667, 678-681 (ND Miss, 2021); *Amato v Elicker*, 534 F Supp 3d 196, 212-215 (D Conn, 2021); *Metroflex Oceanside LLC v Newsom*, 532 F Supp 3d 976, 981-982 (SD Cal, 2021); *Northland Baptist Church of St Paul v Walz*, 530 F Supp 3d 790, 815-817 (D Minn, 2021); *TJM 64, Inc v Harris*, 526 F Supp 3d 331, 336-339 (WD Tenn, 2021); *Flint v Kauai Co*, 521 F Supp 3d 978, 988-993 (D Hawaii, 2021); *Daugherty Speedway, Inc v Freeland*, 520 F Supp 3d 1070, 1075-1078 (ND Ind, 2021); *Antietam Battlefield KOA v Hogan*, 501 F Supp 3d 339, 347 (D Md, 2020); *Bimber's Delwood, Inc v James*, 496 F Supp 3d 760, 782-785 (WD NY, 2020); *Lebanon Valley Auto Racing Corp v Cuomo*, 478 F Supp 3d 389, 400-402 (ND NY, 2020); *Savage v Mills*, 478 F Supp 3d 16, 30-32 (D Maine, 2020); *Oregon Restaurant & Lodging Ass'n v Brown*, ___ F Supp 3d ___, ___ (D Oregon, 2020); slip op at 5-6; *JWC Fitness, LLC v Murphy*, ___ A3d ___, ___ (NJ Super, 2021); slip op at 8-10; *State v Wilson*, 489 P3d 925, 940-942 (NM, 2021); *Friends of Danny DeVito v Wolf*, 227 A3d 872, 893-896 (Pa, 2020). We now join those courts and reject the Gym's claim that its property was taken absent just compensation in violation of the Taking Clauses of the state and federal constitutions.

Initially, we conclude that the Gym's claims do not involve a physical taking of its property. There is no allegation or evidence that the State physically acquired, took possession of, occupied, or appropriated the Gym's private property. Accordingly, this case solely concerns an alleged regulatory taking through the operation of the EOs. The Gym contends that the EOs deprived it of *all* economically productive or beneficial use of its property by completely shuttering the business, thereby resulting in a categorical or "per se" taking that mandated the payment of just compensation. In the alternative, the Gym argues that issuance and enforcement of the EOs gave rise to a noncategorical regulatory taking, as determined upon application of the *Penn Central* balancing test.

We hold as a matter of law that the Gym was not deprived of *all* economically productive or beneficial use of its property as a result of the Governor's EOs; there was no regulatory categorical taking of the Gym's property. In *Tahoe-Sierra Preservation Council, Inc v Tahoe Regional Planning Agency*, 535 US 302, 306; 122 S Ct 1465; 152 L Ed 2d 517 (2002), the United States Supreme Court introduced its opinion as follows:

> The question presented is whether a moratorium on development imposed during the process of devising a comprehensive land-use plan constitutes a per se taking of property requiring compensation under the Takings Clause of the United

States Constitution. This case actually involves two moratoria ordered by respondent Tahoe Regional Planning Agency (TRPA) to maintain the status quo while studying the impact of development on Lake Tahoe and designing a strategy for environmentally sound growth. The first, Ordinance 81-5, was effective from August 24, 1981, until August 26, 1983, whereas the second more restrictive Resolution 83-21 was in effect from August 27, 1983, until April 25, 1984. As a result of these two directives, virtually all development on a substantial portion of the property subject to TRPA's jurisdiction was prohibited for a period of 32 months.

The Supreme Court first noted that it is "inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking[.]' " *Id.* at 323. The Court also observed that when "an owner possesses a full bundle of property rights, the destruction of one strand of the bundle is not a taking." *Id.* at 327 (quotation marks and citation omitted).

Citing language from *Lucas v South Carolina Coastal Council*, 505 US 1003, 1017-1020; 112 S Ct 2886; 120 L Ed 2d 798 (1992), the Court in *Tahoe-Sierra Preservation Council* emphasized that a categorical regulatory taking is limited to extraordinary circumstances in which no productive or economically beneficial use of land is allowed and that there must be a 100% complete elimination or obliteration of value, i.e., a total loss; otherwise the *Penn Central* analysis applies. *Tahoe-Sierra Preservation Council*, 535 US at 330. The Court indicated that a permanent deprivation of an owner's use of an entire parcel of property constitutes a taking of the whole parcel, whereas the imposition of a temporary restriction that merely causes a diminution in value is not a taking of the whole parcel. *Id.* at 332.[13] And according to the Court, a fee simple estate is not "rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted." *Id.* [14]

The Supreme Court clarified that it was not holding "that the temporary nature of a land-use restriction precludes finding that it effects a taking; . . . [it] simply recognize[d] that it should not be given exclusive significance one way or the other." *Id.* at 337. The Court determined "that

---

[13] The Court explained that "[a]n interest in real property is defined by the metes and bounds that describe its geographic dimensions and the term of years that describes the temporal aspect of the owner's interest[,]" and "[b]oth dimensions must be considered if the interest is to be viewed in its entirety." *Id.* at 331-332.

[14] We note that the Supreme Court distinguished the case from its earlier decision in *Lucas* in which the petitioner had purchased two residential beachfront lots for $975,000 upon which he intended to build single-family homes, but thereafter a state statute was enacted that had the direct effect of barring the petitioner from ever erecting any habitable structure on the lots. *Tahoe-Sierra Preservation Council*, 535 US at 329-330; *Lucas*, 505 US at 1006-1007. The *Lucas* Court stated that the taking had been "unconditional and permanent," even though the statute was subsequently amended. *Lucas*, 505 US at 1012. No such permanency existed in *Tahoe-Sierra Preservation Council* or in the instant case.

-16-

the interest in 'fairness and justice' will be best served by relying on the familiar *Penn Central* approach when deciding cases like this, rather than by attempting to craft a new categorical rule." *Id.* at 342.

In this case, the closure of fitness centers for six months was temporary and considerably shorter in duration than the 32-month period involved in *Tahoe-Sierra Preservation Council*. Furthermore, there is no allegation or evidence that the Gym suffered a total loss or the complete elimination or obliteration of value by operation of the EOs. Indeed, the Gym asserted in the complaint that the EOs had "very nearly" destroyed the property as a whole. The property clearly still had value, even if no revenue or profit was generated during the closure.[15] And any lost value relative to the real and personal property was likely recovered as soon as the temporary prohibition was lifted.[16] In sum, we hold that as a matter of law there was no categorical regulatory taking.

Next, we hold as a matter of law that there was no regulatory taking under *Penn Central* analysis. With respect to the *Penn Central* balancing test,[17] the first two factors—economic impact of the EOs and their interference with reasonable investment-backed expectations—weigh in favor of the Gym because its business was in fact shuttered under the EOs, but we do not give those factors all that much weight because the economic impact and the interference with business expectations arising from the closure orders were short lived. Moreover, the third factor—the character of the government's action—was compelling in that the aim of the EOs was to stop the spread of COVID-19, which our Supreme Court described as "the most threatening public-health crisis of modern times" and that "has resulted[] in significant numbers of persons suffering serious illness or death." *In re Certified Questions from the United States Dist Court*, 506 Mich at 337-338. And, once again, the Gym accepted that the Governor's EOs were issued solely for a public purpose, and it did not contest the prudence of the Governor's actions or her authority to issue the EOs.[18] Lending further support for our stance that the character of the Governor's actions strongly

---

[15] Furthermore, lost profits and other consequential damages are generally not recoverable as just compensation in condemnation proceedings; just compensation focuses on lost market value. *United States v Petty Motor Co*, 327 US 372, 377-378; 66 S Ct 596; 90 L Ed 729 (1946).

[16] We find validity in the following argument presented by the State in its brief on appeal:

> The [EOs] . . . did not preclude employees of fitness centers from accessing the centers' indoor facilities, nor did it preclude those businesses from using their facilities to engage in other, lower-risk commercial activity, fitness-related or otherwise (such as the provision of remote fitness services through recorded or live online classes, or the sale of products . . .).

[17] See *Penn Central*, 438 US at 124.

[18] On the issue of reasonableness, for purposes of analyzing an alleged violation of "substantive due process" and not a taking, land-use, we note regulations must be reasonably necessary to preserve the public's health and safety and cannot be arbitrary and capricious. *Bonner v Brighton*, 495 Mich 209, 227-228; 848 NW2d 380 (2014) (referencing the test of reasonableness in regard to zoning ordinances and substantive-due-process challenges). The Gym states in its brief on appeal that it "did not make and will not be making a substantive due process claim."

favors the State, or perhaps actually demands that we find no taking, is language in precedent issued by the United States Supreme Court.

In *Lucas*, 505 US at 1029, the Supreme Court indicated that just compensation is not owed to a property owner for an alleged taking that arises from a law or decree that does nothing more "than duplicate the result that could have been achieved in the courts . . . by the State under its . . . power to abate nuisances that affect the public generally, *or otherwise*." (Emphasis added.)  The Supreme Court then noted, "The principal 'otherwise' that we have in mind is litigation absolving the State . . . of liability for the destruction of real and personal property, in cases of actual necessity, to prevent the spreading of a fire or *to forestall other grave threats to the lives . . . of others*."  *Id.* at 1029 n 16 (quotation marks and citations omitted; emphasis added).  The purpose of the EOs was to forestall the spread of COVID-19 that had hospitalized and killed thousands of Michiganders.

Along those same lines, in *Penn Central*, 438 US at 125, the United States Supreme Court explained:

> [I]n instances in which a state tribunal reasonably concluded that "the health, safety, morals, or general welfare" would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests. See *Nectow v Cambridge*, 277 US 183, 188; 48 S Ct 447; 72 L Ed 842 (1928). Zoning laws are, of course, the classic example, see *Euclid v Ambler Realty Co*, 272 US 365; 47 S Ct 114; 71 L Ed 303 (1926) (prohibition of industrial use); *Gorieb v Fox*, 274 US 603, 608; 47 S Ct 675; 71 L Ed 1228 (1927) (requirement that portions of parcels be left unbuilt); *Welch v Swasey*, 214 US 91; 29 S Ct 567; 53 L Ed 923 (1909) (height restriction), which have been viewed as permissible governmental action even when prohibiting the most beneficial use of the property. . . . .

Similar to this quoted passage, in *Keystone Bituminous Coal Ass'n v DeBenedictis*, 480 US 470, 491-492; 107 S Ct 1232; 94 L Ed 2d 472 (1987), the United States Supreme Court expressed:

> The Court's hesitance to find a taking when the State merely restrains uses of property that are tantamount to public nuisances is consistent with the notion of "reciprocity of advantage" . . . . Under our system of government, one of the State's primary ways of preserving the public weal is restricting the uses individuals can make of their property. While each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others. These restrictions are properly treated as part of the burden of common citizenship. Long ago it was recognized that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community, and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it.  [Quotation marks and citations omitted.]

In light of the precedent, we cannot conclude that the Gym has a viable takings case under the *Penn Central* balancing test.  We will, however, briefly examine a couple of cases cited by the

Gym. The Gym attempts to support its position by citing *Cedar Point Nursery*, 141 S Ct 2063. But in that case, the United States Supreme Court faced the following set of circumstances:

> A California regulation grants labor organizations a "right to take access" to an agricultural employer's property in order to solicit support for unionization. Agricultural employers must allow union organizers onto their property for up to three hours per day, 120 days per year. The question presented is whether the access regulation constitutes a per se *physical* taking under the Fifth and Fourteenth Amendments. [*Id.* at 2069 (citation omitted; emphasis added).]

Because *Cedar Point Nursery* addressed an alleged physical taking, it has no relevance to the instant case. See *Tahoe-Sierra Preservation Council*, 535 US at 323 (it is not proper to treat cases involving a physical taking as controlling precedents when evaluating an alleged regulatory taking).

The Gym's reliance on *Cebe Farms, Inc v United States*, 116 Fed Cl 179 (2014), is also misplaced. In *Cebe Farms*, the plaintiffs sought, in part, just compensation following the destruction by the United States Department of Agriculture of their breeder chickens and eggs as part of the government's effort to stop the spread of and to eradicate a serious poultry disease that had broken out in Southern California. *Id.* at 184. Again, *Cebe Farms* was a case involving the physical destruction or taking of property, distinguishing it from the instant case.

We reverse and remand for entry of judgment in favor of the State. We do not retain jurisdiction. Having fully prevailed on appeal, the State may tax costs under MCR 7.219.


/s/ Jane E. Markey
/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto